**Case No. 23-40423**

---

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

Association of American Physicians and Surgeons Educational Foundation, AAPS,

Plaintiff - Appellant

v.

American Board of Internal Medicine, ABIM; American Board of Obstetrics & Gynecology, ABOG; American Board of Family Medicine, ABFM; Alejandro Mayorkas, Secretary, U.S. Department of Homeland Security,

Defendants - Appellees

---

Appeal from the U.S. District Court for the
Southern District of Texas, Galveston Division (No. 3:22-CV-240)

---

**BRIEF OF APPELLANT**

---

Andrew L. Schlafly
939 Old Chester Rd.
Far Hills, New Jersey 07931
908-719-8608
908-934-9207 (fax)

*Attorney for Plaintiff-Appellant*

# CERTIFICATE OF INTERESTED PARTIES

The case number here is No. 23-40423, *AAPS v. ABIM*.

Appellant Association of American Physicians and Surgeons Educational Foundation is a non-profit corporation that has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5TH CIR. R. 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

**Appellant**: Association of American Physicians and Surgeons Educational Foundation, using undersigned counsel Andrew L. Schlafly, 939 Old Chester Rd., Far Hills, NJ.

**Appellees:** American Board of Internal Medicine, represented by Paul Lantieri, III, Ballard Spahr, L.L.P., 51st Floor, 1735 Market Street, Philadelphia, PA, David Benjamin Gerger, Gerger Hennessy & Martin, L.L.P., Suite 2300, 700 Louisiana Street, Houston, TX, and Andrew Philip Valencia, Ballard Spahr, L.L.P., Suite 2300, 1225 17th Street, Denver, CO,

American Board of Obstetrics & Gynecology, represented by Ashley T. Parrish, McGinnis Lochridge, L.L.P., Ste. 2250, 500 N. Akard Street, Dallas, TX,

American Board of Family Medicine, represented by Cassie J. Dallas and Barry Andrew Moscowitz, Thompson, Coe, Cousins & Irons, L.L.P., 25th Floor, 700 N. Pearl Street, Plaza of the Americas, Dallas, TX, and

Alejandro Mayorkas, Secretary, U.S. Department of Homeland Security, represented by Daniel Bentele Hahs Tenny and Michael P. Clendenen, U.S. Department of Justice, Civil Division, 1100 L Street, N.W. Washington, DC, and Simon Christopher Brewer, U.S. Department of Justice, Civil Division, 950

Pennsylvania Avenue, N.W., Washington, DC.

Dated: September 10, 2023                              s/ Andrew L. Schlafly
                                                       Attorney for Appellant

## STATEMENT REGARDING ORAL ARGUMENT

Appellant respectfully requests oral argument due to the seriousness of the First Amendment, censorship, and federal overreach issues presented here.

# TABLE OF CONTENTS

Page(s)

Certificate of Interested Parties.................................................................. ii

Statement Regarding Oral Argument ........................................................iv

Table of Contents ...................................................................................... v

Table of Authorities ............................................................................... vii

Jurisdictional Statement ............................................................................1

Statement of Issues....................................................................................1

Statement of the Case................................................................................2

     A. Factual Background ........................................................................3

     B. Relevant Procedural History ........................................................19

     C. Rulings Presented for Review.......................................................19

Summary of Argument .............................................................................24

Argument..................................................................................................26

I. Standard of Review...............................................................................26

II. The District Court Erred in Failing to Recognize the First Amendment Right to Hear, and in Construing Too Narrowly Standing Under the First Amendment to Assert This Right ..........................................................27

     A. The District Court Erred in Overlooking that this Fifth Circuit Has Recognized a First Amendment Right to Hear ......................................28

     B. Plaintiff AAPS Has Standing to Object to the Infringement on Its First Amendment Right ..........................................................................29

C. It Is Unnecessary to Reach the Issue of Whether the Board
Defendants Are State Actors, But If This Issue Is Addressed
then State Action by the Board Defendants Should Be Found ...............32

III. The District Court Prematurely Dismissed the Claims Against the Board
Defendants Based on Its Own Speculation about Traceability and
Redressability ...........................................................................................37

IV. Antitrust Injury Is Not Limited to Consumers and Competitors,
and the District Court Erred in Dismissing on This Basis ......................38

V. The Claim against Mayorkas Is Not Moot Because Government's Improper
Censorship Activities Have Not Stopped, and There Remains
the Unresolved FACA Violation ...........................................................43

A. This Action Is Not Moot Because the Government Merely Dispersed
Its Censorship Activities among Other Government Employees ...........43

B. A Remand Is Necessary so that Plaintiff AAPS Can Pursue
Its Valid FACA Claim ..........................................................................47

VI. As Applied Below in This Case, the Local Rule in Galveston Preventing
Leave to Amend Is Contrary to the Federal Rules and Controlling Precedent,
and Should Be Reversed ........................................................................51

Conclusion .................................................................................................55

Certificate of Compliance ........................................................................56

# TABLE OF AUTHORITIES

**Cases**                                                              Page(s)

*Abraugh v. Altimus*, 26 F.4th 298 (5th Cir. 2022) .................................30

*Adarand Constructors, Inc. v. Slater*, 528 U.S. 216 (2000) ....................43

*Allyn v. Am. Bd. of Med. Specialties, Inc.*, Case No: 5:18-cv-355-Oc-30PRL,
  2019 WL 297459 (M.D. Fla. Jan. 3, 2019), *adopted at* 2019 WL 293277
  (M.D. Fla. Jan. 23, 2019) .............................................................34

*Apter v. HHS*, No. 22-40802,
  2023 U.S. App. LEXIS 23401 (5th Cir. Sept. 1, 2023).......................... 53-54

*Ariz. Right to Life PAC v. Bayless*, 320 F.3d 1002 (9th Cir. 2003)........................27

*Ashland Chem. v. Barco Inc.*, 123 F.3d 261 (5th Cir. 1997) ........................... 27, 52

*Babbitt v. UFW Nat'l Union*, 442 U.S. 289 (1979) .................................31

*Ballew v. Cont'l Airlines, Inc.*, 668 F.3d 777 (5th Cir. 2012) ................................26

*Barbosa v. Cty. of El Paso*, No. 97-51098,
  1998 U.S. App. LEXIS 39641 (5th Cir. Sep. 8, 1998) ................................27

*Barilla v. City of Hous.*, 13 F.4th 427 (5th Cir. 2021)................................31

*Basiardanes v. Galveston*, 682 F.2d 1203 (5th Cir. 1982) ...................................28

*Bass v. Parkwood*, 180 F.3d 234 (5th Cir. 1999) ...................................33

*Blue Shield of Va. v. McCready*, 457 U.S. 465 (1982)...........................41

*Blum v. Yaretsky*, 457 U.S. 991 (1982) ...................................33

*Brader v. Allegheny Gen. Hosp.*, 64 F.3d 869 (3d Cir. 1995)................................39

*Brooks v. Auburn Univ.*, 412 F.2d 1171 (5th Cir. 1969) .................................. 28-29

*Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182 (1999)...................................31

*Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104 (1986) ........................41

*Cargill, Inc. v. United States*, 173 F.3d 323 (5th Cir. 1999)  ................................49

*Citizens United v. FEC*, 558 U.S. 310 (2010)........................................31

*City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283 (1982) ........................43

*Ctr. for Biological Diversity v. BP Am. Prod. Co*,
  704 F.3d 413 (5th Cir. 2013) ........................................................26

*Ctr. for Individual Freedom v. Carmouche*,
   449 F.3d 655 (5th Cir. 2006) .......................................................... 26, 27, 29

*Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022) ..........................6

*Edmiston v. Borrego*, 75 F.4th 551 (5th Cir. 2023)...................................37

*Elec. Privacy Info. Ctr. v. Drone Advisory Comm.*, 995 F.3d 993 (2021) .......47, 48

*Elrod v. Burns*, 427 U.S. 347 (1976) .......................................................10

*Envtl. Conservation Org. v. City of Dallas*, 529 F.3d 519 (5th Cir. 2008) .............26

*Fairchild v. Liberty ISD*, 597 F.3d 747 (5th Cir. 2010)...........................29

*FEC v. Wis. Right to Life, Inc.* ("*WRTL*"), 551 U.S. 449 (2007)...........................31

*Foman v. Davis*, 371 U.S. 178 (1962) .......................................................54

*Flagg Bros., Inc. v. Brooks*, 436 U.S. 149 (1978) ....................................33

*Freedom Path, Inc. v. I.R.S.*, 913 F.3d 503 (5th Cir. 2019)....................................29

*Griggs v. Hinds Junior Coll.*, 563 F.2d 179 (5th Cir. 1977) ...........................54

*Hernandez v. W. Tex. Treasures Estate Sales, L.L.C.*, No. 22-50048, 2023 U.S.
   App. LEXIS 21619 (5th Cir. Aug. 17, 2023) ...........................................54

*Houston Chronicle v. City of League City*, 488 F.3d 613 (5th Cir. 2007)..............29

*Jackson v. Crosby*, 437 F.3d 1290 (11th Cir. 2006) ...............................52

*Jackson v. Metropolitan Edison Co.*, 419 U.S. 345 (1974)....................................33

*Lamont v. Postmaster General*, 381 U.S. 301 (1965) ...........................................29

*Lone Star Motor Import, Inc. v. Citroen Cars Corp.*,
   288 F.2d 69 (5th Cir. 1961) ...........................................................54

*Lorain Journal Co. v. United States*, 342 U.S. 143 (1951) ....................................42

*Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982) ...............................33

*Lujan v. Def's of Wildlife*, 504 U.S. 555 (1992) ......................................28

*Majors v. Abell*, 317 F.3d 719 (7th Cir. 2003)....................................27

*Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219 (1948).....41

*Martin v. City of Struthers*, 319 U.S. 141 (1943) ....................................29

*Meese v. Keene*, 481 U.S. 465 (1987)....................................29

*Meza v. Livingston*, 607 F.3d 392 (5th Cir. 2010) ...........................................43

*Missouri v. Biden*, No. 23-30445 (5th Cir. Sept. 8, 2023) ....................................32

*NAACP v. City of Kyle, Tex.*, 626 F.3d 233 (5th Cir. 2010)...................................26

*NetChoice v. Paxton*, 49 F.4th 439 (5th Cir. 2022) ........................................ 34-35

*Norwood v. Harrison*, 413 U.S. 455 (1973) ........................................................33

*NRA of Am., Inc. v. McCraw,* 719 F.3d 338 (5th Cir. 2013) ...............................26

*Nw. Ecosystem All. v. Office of the United States Trade Representative*,
    No. C99-1165R, 1999 U.S. Dist. LEXIS 21689
    (W.D. Wash. Nov. 8, 1999)........................................................................49

*Pickering v. Bd. Of Educ. Of Township High Sch. Dist. 205, Will County, Ill*,
    391 U.S. 563 (1968)..................................................................................31

*Pruneyard Shopping Ctr. v. Robins*, 447 U.S. 74 (1980) .....................................35

*Public Citizen v. U.S. Dep't of Just.*, 491 U.S. 440 (1989) ..................................47

*Pub. Emps. for Env't Responsibility v. Nat'l Park Serv.*,
    Civil Action No. 19-3629 (RC), 2022 U.S. Dist. LEXIS 93204
    (D.D.C. May 24, 2022) ........................................................................48, 49

*Ragsdale v. Turnock*, 841 F.2d 1358 (7th Cir. 1988) ..........................................44

*Reiter v. Sonotone Corp.*, 442 U.S. 330 (1979) ...................................................40

*Richard v. Hoechst Celanese Chem. Grp., Inc.*,
    355 F.3d 345 (5th Cir. 2003) ................................................................ 33-34

*Roe v. Wade*, 410 U.S. 113 (1973)................................................................ 11-12

*Sambrano v. United Airlines*, 45 F.4th 877 (5th Cir. 2022) .................................42

*Sossamon v. Lone Star State of Texas*, 560 F.3d 316 (5th Cir. 2009),
    *aff'd sub nom. Sossamon v. Texas*, 563 U.S. 277 (2011) ............................44

*Speech First, Inc. v. Fenves*, 979 F.3d 319 (5th Cir. 2020)........................ 27, 28, 30

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014)........................................28

*Turner v. Pleasant*, 663 F.3d 770 (5th Cir. 2011) ....................................................26

*United States v. Concentrated Phosphate Exp. Ass'n*, 393 U.S. 199 (1968) ..........43

*United States v. One Piece of Real Property*, 363 F.3d 1099 (11th Cir. 2004) ......52

*United States v. S. Motor Carriers Rate Conference, Inc.* ................................39, 40

*Virginia v. Am. Booksellers' Ass'n, Inc.*, 484 U.S. 383 (1988).............................28

*Virginia State Board of Pharmacy v. Virginia Citizens Consumer
    Council, Inc.*, 425 U.S. 748 (1976)..................................................................28

*Vitagliano v. Cty. of Westchester*, 71 F.4th 130 (2d Cir. 2023) ............................27

*Waggoner v. Denbury Onshore, L.L.C.*, 612 F. App'x 734 (5th Cir. 2015) ....41, 42

*Whitney v. California*, 274 U.S. 357 (1927) .............................................................8

*Wong v. Stripling*, 881 F.2d 200 (5th Cir. 1989) .....................................................33

## Constitution, Statutes, Regulation, and Rules

U.S. CONST. amend. I ..................................................................................................24

5 U.S.C. § 706(2)(A), (B) and (D) .................................................................... 50-51

18 U.S.C. § 202(a) .....................................................................................................15

28 U.S.C. § 1291 ...........................................................................................................1

28 U.S.C. § 1331 ...........................................................................................................1

28 U.S.C. § 1337 ...........................................................................................................1

28 U.S.C. § 1361 ...........................................................................................................1

28 U.S.C. § 1367 ...........................................................................................................1

28 U.S.C. § 2071(a) ....................................................................................................52

28 U.S.C. § 2072 ........................................................................................................52

Clayton Act, Section 4, 15 U.S.C. § 15 .............................................................1, 41

Clayton Act, Section 16, 15 U.S.C. § 26 ...........................................................1, 41

Federal Advisory Committee Act (FACA).........vi, 2, 8, 9, 15, 18, 23, 25, 43, 47-51
     5 U.S.C. app. 2.................................................................................................47
     5 U.S.C. app. 2, § 5(b)(2) ...............................................................................49
     Section 10(b), 5 U.S.C. app. 2, § 10(b) ........................................................50

Sherman Act, Section 2, 15 U.S.C. § 2 ....................................................................39

41 C.F.R. § 102-3.145.................................................................................................48

FED. R. CIV. P. 12(b) ...........................................................................................51, 53

FED. R. CIV. P. 12(b)(1).......................................................................................19, 21

FED. R. CIV. P. 12(b)(6)..............................................................................................21

FED. R. CIV. P. 12(e)...................................................................................................51

FED. R. CIV. P. 12(f)...................................................................................................51

FED. R. CIV. P. 15(a)...................................................................................................54

FED. R. CIV. P. 15(a)(2) ........................................................54

FED. R. CIV. P. 15(a)(1)(B) ...................................................51

FED. R. CIV. P. 56 ..................................................................52

FED. R. CIV. P. 83(a)..............................................................52

Galveston Division Rules of Practice 6
https://www.txs.uscourts.gov/sites/txs/files/
GalvestonDistrictCourtRulesofPractice.pdf ..............................23, 26, 51, 53

**Introduced But Never-Enacted Legislation**

A Bill To Amend the Communications Act of 1934, S. 2448,
117th Cong. (2021) ..........................................................14

COVID-19 Disinformation Research and Reporting Act of 2021, S. 913,
117th Cong. (2021) ......................................................... 14

**Government Statements and Postings on Its Websites**

Charter of the DHS Homeland Security Advisory Council,
https://www.dhs.gov/sites/default/files/publications/hsac_charter_ren
ewal_508.pdf ...................................................................16

Dep't of Homeland Security, Homeland Security Advisory Council
Disinformation Best Practices and Safeguards Subcommittee (the
"Subcommittee"), Final Report (Aug. 24, 2022)
https://perma.cc/M9H6-C6XX ..............................................3, 44, 46, 47, 48

DHS Needs a Unified Strategy to Counter Disinformation Campaigns, No. OIG-
22-58, DHS Inspector General (Aug. 10, 2022)
https://www.oig.dhs.gov/sites/default/files/assets/2022-08/OIG-22-58-
Aug22.pdf ..........................................................................44

DHS Press Release (May 2, 2022)
https://www.dhs.gov/news/2022/05/02/fact-sheet-dhs-internal-
working-group-protects-free-speech-other-fundamental-rights.....................8

DHS Statement, "Following HSAC Recommendation, DHS terminates
Disinformation Governance Board" (Aug. 24, 2022)
https://perma.cc/4WVL-Y3D2 ..............................................48, 50

Docinfo by the Federation of State Medical Boards, https://www.docinfo.org/.....36

xi

Federation of State Medical Boards Statement (July 29, 2021),
https://www.fsmb.org/advocacy/news-releases/fsmb-spreading-covid-19-
vaccine-misinformation-may-put-medical-license-at-risk/ .........................35

Letter by 20 State Attorneys General to Secretary Mayorkas
(May 5, 2022)
https://www.oag.state.va.us/files/MIYARES2022/DGBLetter_Final.p
df ............................................................................................................8

Remarks by President Biden at Virtual Meeting on Military Deployments
Supporting Hospitals for the COVID-19 Response, The White House
(January 13, 2022),
https://tinyurl.com/45ezsejt ............................................................7

"Transcript: Dr. Anthony Fauci on 'Face the Nation'" (Nov. 28, 2021)
https://www.cbsnews.com/news/transcript-dr-anthony-fauci-on-face-
the-nation-november-28-2021/ .....................................................4

**Articles and Internet Postings**

ABOG's "Statement Regarding Misinformation and Disinformation and
Medical Professionalism" (July 7, 2022)
https://www.abog.org/about-abog/news-
announcements/2022/07/07/statement-regarding-misinformation-
and-disinformation-and-medical-professionalism ........................................5

ABOG's "Statement Regarding Dissemination of COVID-19 Misinformation"
(Sept. 27, 2021)
https://www.abog.org/about-abog/news-
announcements/2021/09/27/statement-regarding-dissemination-
of-covid-19-misinformation .........................................................36

"A Message From Dr. Richard Baron About COVID-19 Misinformation,"
ABIM Blog (Sept. 28, 2021) https://blog.abim.org/a-message-from-
dr-richard-baron-about-covid-19-misinformation/ ......................................12

Associated Press, "Disinformation Governance Board, the so-called
'Ministry of Truth,' paused as Nina Jankowicz resigns" (May 19,
2022)
https://www.al.com/news/2022/05/disinformation-governance-board-
the-so-called-ministry-of-truth-paused-as-nina-jankowicz-
resigns.html ...................................................................................9

Michael DePeau-Wilson, "Regulators Move Against Two
'Misinformation' Doctors," *MedPage* (November 1, 2022)
https://www.medpagetoday.com/special-reports/exclusives/101529 ..........34

John J. Miles, 1 *Health Care and Antitrust Law* (2014).........................................41

Joint Statement on Dissemination of Misinformation (Sept. 9, 2021)
https://www.abim.org/media-center/press-releases/joint-statement-
on-dissemination-of-misinformation/.............................................................36

Allie Malloy and Arlette Saenz, "Biden calls out Elon Musk and Twitter at
Chicago-area fundraiser," *CNN* (Nov. 4, 2022)
https://www.cnn.com/2022/11/04/politics/joe-biden-elon-musk-twitter/
index.html .............................................................................................. 45-46

Jasmine Mithani, et al., "How Americans View Biden's Response To The
Coronavirus Crisis," *FiveThirtyEight* (Nov. 29, 2022)
https://projects.fivethirtyeight.com/coronavirus-polls/ (viewed Sept.
9, 2023)...........................................................................................................9

Chris Nelson, "Florida Doctor Stripped of Board Certification Over
'COVID-19 Misinformation,'" *The Floridian* (March 22, 2023)
https://floridianpress.com/2023/03/florida-doctor-stripped-of-board-
certification-over-covid-19-misinformation/ ..................................................7

Steven Nelson, "Feds keep Facebook censorship portal despite DHS
Disinformation Board demise," *New York Post* (Nov. 2, 2022)
https://nypost.com/2022/11/02/white-house-insists-its-not-using-facebook-
censorship-portal/ .........................................................................................45

https://abimfoundation.org/person/richard-j-baron-md-president-and-ceo.............11

# JURISDICTIONAL STATEMENT

This appeal is brought under 28 U.S.C. § 1291 from the final judgment entered on May 23, 2023, by the United States District Court, Southern District of Texas, Galveston Division. (ROA.436) Plaintiff-Appellant filed a timely Notice of Appeal on July 13, 2023. (ROA.437) The district court had jurisdiction over these federal law claims under 28 U.S.C. §§ 1331, 1337, and 1361, and 15 U.S.C. §§ 15, 26. Supplemental jurisdiction over the claim for tortious interference existed below under 28 U.S.C. § 1367, but is not at issue on this appeal.

# STATEMENT OF ISSUES

The issues presented are:

1.      Is there standing to challenge censorship based on its interference with the right to hear, in this lawsuit brought by a sponsor of medical conferences against Defendants for their infringement on speech desired at the conferences?

2.      Is it appropriate to dismiss a complaint at the pleading stage based on speculation by the court about whether traceability and redressability are more likely than not, without first allowing a plaintiff the opportunity to develop a factual record as to these requirements of standing?

3.      Is antitrust injury narrowly limited to only consumers and competitors on a Sherman Act Section 2 claim?

4.     Is mootness in a First Amendment challenge attained by the federal government merely dispersing its originally centralized censorship campaign among multiple other offices within the federal agency?

5.     Are the transparency requirements of the Federal Advisory Committee Act ("FACA") satisfied by the government withholding documents related to a decision-making process by a FACA committee that made a recommendation directly to the Secretary of the Department of Homeland Security?

6.     Is the unusual Galveston Division Local Rule 6, which curtails the automatic right to amend a complaint and precludes granting leave later to amend, consistent with the Federal Rules of Civil Procedure and controlling precedents of this Fifth Circuit which require that leave to amend be freely granted?

## STATEMENT OF THE CASE

This lawsuit is by Plaintiff Association of American Physicians and Surgeons Educational Foundation ("AAPS"), as a co-sponsor of medical conferences and publisher of educational materials on the internet, against Defendants concerning their unprecedented campaigns to censor speech that they disparage as "misinformation" or "disinformation". (ROA.8-9, ¶ 1) Plaintiff allege that Defendants, who include the federal government and several board-certifying entities, acted in an apparently coordinated manner using similar timing and terminology, to censor those who exercise their First Amendment rights on issues

2

of public concern. (*Id.*) Defendants' censorship has harmed, and continues to harm, Plaintiff AAPS. (ROA.15-16, ¶¶ 25, 29)

Defendants censor "disinformation" and "misinformation", which are defined broadly by Defendant Mayorkas in an official document on which he relied in the district court:

> Disinformation is, in essence, a particularly pernicious form of inaccurate information. … Disinformation has three variants: ***Disinformation*** is the deliberate dissemination of falsehoods. ***Misinformation*** is the unintentional propagation of falsehoods. Malinformation is the intentional spreading of genuine information with the intent to cause harm, for example, by moving private and personal information into the public sphere. …

Dep't of Homeland Security, Homeland Security Advisory Council Disinformation Best Practices and Safeguards Subcommittee (the "Subcommittee"), Final Report at 6 (Aug. 24, 2022) (emphasis added).[1]

## A. Factual Background

Defendants American Board of Internal Medicine ("ABIM"), American Board of Obstetrics & Gynecology ("ABOG"), and American Board of Family Medicine ("ABFM" and collectively, the "Board Defendants") have certification monopolies in their respective specialties, which are based primarily on written multiple-choice medical examinations. (ROA.9, ¶ 2) Unrelated to their qualifying examinations, the Board Defendants are also outspokenly allied with the Biden administration on the political issues of abortion, surgical and pharmacological

---

[1] https://perma.cc/M9H6-C6XX (viewed Sept. 9, 2023).

transgender interventions, lockdowns, mask and vaccine mandates. (*Id.*) The Board Defendants announced their campaign to take action against certifications earned by physicians who make public statements with which the Board Defendants disagree. (ROA.9-10, ¶ 3)

This partisan retaliation by the Board Defendants has been based in part on statements by physicians warning pregnant woman against receiving the Covid vaccine, even though the World Health Organization issued a similar warning in 2021. (ROA.10, ¶ 4) Retaliation has occurred by the Board Defendants against physicians who were praised by Robert F. Kennedy, Jr., in his bestselling book, *The Real Anthony Fauci*. (*Id.*) In some cases, the retaliation is based expressly on criticism by physicians of Dr. Fauci, who as a government official may of course be freely criticized. (*Id.*)

Though repeatedly proven wrong or having contradicted himself, Dr. Fauci declared on the nationally televised *Face the Nation* that "I represent science" and that his critics "are really criticizing science." (ROA.10, ¶ 5)[2] Republican Senators, including Dr. Rand Paul (R-KY) and Ted Cruz (R-TX), rebuked Dr. Fauci for his statements and yet the Board Defendants seek to revoke earned board certifications from physicians in part for criticizing Dr. Fauci. (*Id.*)

---

[2] "Transcript: Dr. Anthony Fauci on 'Face the Nation'" (Nov. 28, 2021) https://www.cbsnews.com/news/transcript-dr-anthony-fauci-on-face-the-nation-november-28-2021/ (viewed Sept. 9, 2023).

Specifically, on or about May 26, 2022, ABIM abused its monopoly power by sending unprecedented threatening letters to multiple prominent ABIM-certified physicians, including one practicing in Texas, for making public statements that disagreed with the approach taken by Dr. Fauci and the Biden administration to Covid-19. (ROA.10-11, ¶ 6) Likewise, and apparently in a coordinated manner, the American Board of Family Medicine (ABFM) abused its monopoly power by sending threatening letters to multiple prominent ABFM-certified physicians, for making statements critical of positions promoted by the Biden administration concerning Covid-19. (*Id.*) These threatening letters by ABIM and ABFM did not explain any specific inaccuracy about anything said by these physicians, or provide any evidence of any falsehood, but instead generally objected to criticisms by these physicians of positions concerning Covid-19 that have been in the public debate. (*Id.*)

Defendant ABOG, in a public announcement dated July 7, 2022, threatened physicians who make public statements against abortion or contraception, indicating that "[e]ligibility to gain or maintain ABOG certification may be lost." (ROA.11, ¶ 7)[3] ABOG is stridently supportive of universal access to abortion and

___

[3] ABOG's "Statement Regarding Misinformation and Disinformation and Medical Professionalism" (July 7, 2022) https://www.abog.org/about-abog/news-announcements/2022/07/07/statement-regarding-misinformation-and-disinformation-and-medical-professionalism (viewed Sept. 9, 2023).

taxpayer funding of it, and ABOG sharply criticized the landmark Supreme Court decision in *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022). (*Id.*)

Although only official state medical boards have the proper authority to regulate the practice of medicine, certifications by the Board Defendants constitute a *de facto* credential required to practice in most hospitals and participate in most networks. (ROA.11, ¶ 8; ROA.31, ¶ 108) Many hospitals and insurance networks require certification by the Board Defendants, and thus their revocation of board certification can have a devastating effect on the practice of medicine by a physician, in some cases being tantamount to revoking his license to practice medicine. (ROA.28, ¶ 81) The Board Defendants each have certification monopolies in their respective medical practice specialties, each controlling more than 80% of the market for certification of physicians in their corresponding specialties. (ROA.31, ¶ 107) The Board Defendants have invidiously abused their examination-based monopoly in order to interfere with physicians' freedom of speech, by threatening revocation of their certifications based on statements by physicians on matters of public concern. (ROA.32, ¶ 110) The Board Defendants have thereby wrongly interfered with the market for medical conferences and the posting of presentations from such conferences on the internet. (ROA.32, ¶ 111) Indeed, a speaker at one of AAPS's conferences last year was stripped of his board

certification by the Defendant ABFM, stayed pending his appeal.[4]

Meanwhile Defendant Mayorkas, in his capacity as a Cabinet official in the Biden administration, created the Orwellian Disinformation Governance Board ("DGB") in order to censor disfavored information based on its content. (ROA.11, ¶ 9) The creation of the DGB and the Board Defendants' threatening letters to physicians came within months of President Joe Biden issuing the following directive:

> I make a special appeal to social media companies and media outlets: Please deal with the misinformation and disinformation that's on your shows. ***It has to stop***. (¶ 10)[5]

Twenty (20) State Attorneys General, led by the Virginia Attorney General and joined by the Texas Attorney General, signed and publicly released a letter addressed to Defendant Mayorkas, dated May 5, 2022, which protested the unconstitutionality of the DGB.  These State Attorneys General agreed that:

> ***The existence of the Disinformation Governance Board will inevitably have a chilling effect on free speech***. Americans will hesitate before they voice their constitutionally protected opinions, knowing that the government's censors may be watching, and some will decide it is safer to keep their opinions to themselves. The resulting damage to our political system and our culture will be incalculable: as a democracy, our political

---

[4] Chris Nelson, "Florida Doctor Stripped of Board Certification Over 'COVID-19 Misinformation,'" *The Floridian* (March 22, 2023) https://floridianpress.com/2023/03/florida-doctor-stripped-of-board-certification-over-covid-19-misinformation/ (viewed Sept. 9, 2023).

[5] Remarks by President Biden at Virtual Meeting on Military Deployments Supporting Hospitals for the COVID-19 Response, The White House (January 13, 2022, emphasis added), https://tinyurl.com/45ezsejt (viewed Sept. 9, 2023).

debates and decisions are supposed to take place in the public square, where every citizen can participate, rather than in government office buildings where hand-picked and unaccountable partisan committees are insulated from public supervision and criticism. …

[The DGB] is therefore *already* chilling free speech and impeding the political process in Virginia and every other State.[6]

Their strong letter repeated what "Justice Brandeis explained long ago, [that] 'the remedy to be applied is more speech, not enforced silence.' *Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring)." (ROA.12, ¶ 12)[7]

As the Department of Homeland Security ("DHS") announced in its press release dated May 2, 2022, it directed that the "Homeland Security Advisory Council ('HSAC') make recommendations for how the Department can most effectively and appropriately address disinformation that poses a threat to the homeland, while protecting free speech and other fundamental rights." (ROA.12-13, ¶ 13)[8]  HSAC is a committee subject to the requirements of the Federal Advisory Committee Act ("FACA"). (*Id.*)

Amid a public backlash, on May 18, 2022, it was widely reported that DHS "paused" its DGB and that recommendations were expected from the Homeland

---

[6] Letter by 20 State Attorneys General  to Secretary Mayorkas (May 5, 2022) https://www.oag.state.va.us/files/MIYARES2022/DGBLetter_Final.pdf (pp. 2, 4, emphasis added in first sentence, emphasis in original in last sentence, viewed Sept. 9, 2023).

[7] *Id.* (p. 3).

[8] DHS Press Release (May 2, 2022) https://www.dhs.gov/news/2022/05/02/fact-sheet-dhs-internal-working-group-protects-free-speech-other-fundamental-rights (viewed Sept. 9, 2023).

Security Advisory Council (HSAC) concerning how the DGB should proceed further. (ROA.13, ¶ 14)[9] Yet HSAC, though subject to FACA, then continued to act in ongoing violations of FACA with respect to the DGB. (*Id.*)

Polling showed that many people agreed with physicians who criticized government approaches to Covid-19. (ROA.13, ¶ 16) The non-partisan, widely cited "fivethirtyeight.com" website revealed that 43.2% of Americans disapproved of Biden's handling of Covid-19 as of June 22, 2022. (*Id.*)[10]

### Parties

Founded in 1996, Plaintiff AAPS Educational Foundation ("AAPS") is a non-profit organization incorporated under the laws of Arizona and headquartered in Tucson, Arizona. AAPS co-sponsors medical education conferences, including subsidizing attendance by medical students and residents at such conferences. (ROA.7, ¶ 18) AAPS posts videos on the internet of presentations made by physicians and others at its conferences. (*Id.*) AAPS raises money based on these activities. (*Id.*) Defendants' actions harm Plaintiff AAPS's conferences and fundraising efforts, which depend on robust freedom of speech in-person and on

---

[9] Associated Press, "Disinformation Governance Board, the so-called 'Ministry of Truth,' paused as Nina Jankowicz resigns" (May 19, 2022) https://www.al.com/news/2022/05/disinformation-governance-board-the-so-called-ministry-of-truth-paused-as-nina-jankowicz-resigns.html (viewed Sept. 9, 2023).
[10] Jasmine Mithani, et al., "How Americans View Biden's Response To The Coronavirus Crisis," *FiveThirtyEight* (Nov. 29, 2022) https://projects.fivethirtyeight.com/coronavirus-polls/ (viewed Sept. 9, 2023).

the internet. (ROA.6-7, ¶ 17) Presenters at conferences co-sponsored by Plaintiff

AAPS have received letters threatening revocation of their earned board

certifications, for statements they made at AAPS co-sponsored conferences. (*Id.*)

Plaintiff AAPS has First Amendment injuries to its rights of freedom of

speech, including its right to hear, for which the "loss of First Amendment

freedoms, for even minimal periods of time, unquestionably constitutes irreparable

injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). (ROA.16, ¶ 29) Defendants are

causing a direct monetary harm to Plaintiff AAPS in the form of a chilling effect

on speakers at its conferences, a corresponding decrease in attendance at those

events, lost internet traffic with respect to a reduction in videos posted from those

conferences, and a resultant corresponding decline in conference fees and

donations to Plaintiff. (ROA.15-16, ¶ 25)

Defendant American Board of Internal Medicine ("ABIM") is a nonprofit

organization based in Philadelphia, Pennsylvania, which certifies physicians

nationwide in the specialty of internal medicine, primarily on the basis of

performance on a written multiple-choice examination. (ROA.14, ¶ 19)

Defendant American Board of Obstetrics & Gynecology ("ABOG") is a

nonprofit organization having its principal place of business in Dallas, Texas.

(ROA.14, ¶ 20) ABOG certifies physicians nationwide in the specialty of obstetrics

and gynecology, also primarily on the basis of performance on a written multiple-

choice examination. (*Id.*)

Defendant American Board of Family Medicine ("ABFM") is a nonprofit organization based in Lexington, Kentucky, which certifies physicians nationwide in the specialty of family medicine, on the basis primarily of performance on a written multiple-choice examination. (ROA.14-15, ¶ 21)

The Board Defendants have no meaningful academic affiliations, and no demonstrable expertise in anything related to Covid-19, its treatment, vaccination of pregnant women, mask mandates, lockdowns, or harm caused by abortion. (ROA.17, ¶ 32) For example, ABIM's longtime president and CEO, Richard J. Baron, MD, has a background in medical administrative jobs and implementing electronic medical records, and listed no research, teaching, scholarship, or ongoing academic affiliations on his biography on his website. (*Id.*)[11]  He included in his own posted biography that he is a member of the politically oriented Aspen Institute Health Strategy Group, along with CEOs of businesses that have substantial financial interests in approaches to the Covid pandemic. (*Id.*)

Defendants ABIM and ABOG engage in a pattern of advocating for positions taken by the Biden administration on multiple social issues, including abortion. (ROA.17-18, ¶ 33) On the very same day that the Biden administration made statements criticizing the Supreme Court decision that overturned *Roe v.*

---

[11]     https://abimfoundation.org/person/richard-j-baron-md-president-and-ceo (viewed Sept. 9, 2023).

*Wade*, ABIM made intemperate and unjustified public statements against that Court, accusing it of inflicting harm on health care in the United States "for many years to come." (*Id.*) ABIM is not even the specialty board for obstetrics, and has no legal expertise on constitutional issues. (*Id.*)

On behalf of ABIM, and while internet-posting as its President and CEO, Dr. Baron defamed those who disagree with his approach to Covid-19 as being "friends of the virus." *A Message From Dr. Richard Baron About COVID-19 Misinformation*. (ROA.18, ¶ 34)[12] Dr. Baron also falsely stated that "COVID prevention" is the purpose of Covid vaccination, and that physicians "must" agree with this falsehood:

> [T]he community of physicians that composes ABIM **must feel obliged** to recommend vaccination as a first-line strategy for COVID **prevention**. (¶ 35)[13]

To the contrary, the CDC itself has admitted that Covid vaccination does not prevent transmission of Covid. (ROA.18, ¶ 36) Many high-profile officials, including Dr. Anthony Fauci himself, have reportedly contracted Covid-19 despite being multiply vaccinated with multiple booster shots, along with wearing masks. (*Id.*)

---

[12] "A Message From Dr. Richard Baron About COVID-19 Misinformation," ABIM Blog (Sept. 28, 2021) https://blog.abim.org/a-message-from-dr-richard-baron-about-covid-19-misinformation/ (emphasis added, viewed Sept. 9, 2023).
[13] *Id.* (emphasis added).

In its own Policies & Procedures, ABIM states that its primary grounds for revoking its board certification is if a physician's license to practice medicine has been restricted, suspended, or revoked, or if he has engaged in "misconduct in connection with an ABIM examination." *ABIM Policies & Procedures* p. 18. (ROA.18, ¶ 37) ABIM has not claimed any authority in its *Policies & Procedures* to discipline physicians based on disagreement with their public statements on matters of public policy, and yet is attempting to do that anyway. (*Id.*)

Similar to the unprecedented conduct by the ABIM alleged herein, Defendant ABFM has sent out threatening letters to physicians based not on their treatment of patients or their performance on ABFM's written multiple-choice examinations, but based on the physicians' public statements about matters of public policy. (ROA.19, ¶ 38)

On July 7, 2022, Defendant ABOG announced that it might revoke board certifications of physicians opposed to abortion if they provide "false or misleading information" that is "used to advocate for legislation, regulations, criminal code, and health policy." (ROA.19, ¶ 39; *see also* n.3, *supra*) ABOG denies harm caused by abortion, even harm reported in peer-reviewed published medical studies. (ROA.19, ¶ 39) ABOG is chilling free speech on this issue by physicians, and harming Plaintiff AAPS by interfering with presentations at its conferences. (*Id.*)

The Board Defendants' conduct appears to be coordinated, in a concerted

attempt to advance a partisan political agenda. (ROA.19, ¶ 40) Upon information and belief, Board Defendants are aware of the partisan positions taken by officials in the Biden administration on the relevant issues, and Board Defendants are responding to pressure or requests by the Biden administration or Democrats in Congress to censor the expression of independent viewpoints by physicians. (*Id.*)

As to Defendant Alejandro Mayorkas, he is the Secretary of the U.S. Department of Homeland Security. (ROA.15, ¶ 22) By establishing the Disinformation Governance Board and authorizing similar activities, Defendant Mayorkas chills and infringes on AAPS's First Amendment right of freedom of speech, and causes immediate and redressable First Amendment injuries to AAPS. (ROA.16, ¶ 27) Congress has considered but never enacted legislation to authorize such a governmental board like the DGB. (ROA.25, ¶ 66)[14] Defendant Mayorkas thereby acted without congressional authorization, rendering the DGB an *ultra vires*, unconstitutional abuse of power by the Executive Branch. (ROA.25, ¶ 67)

The mere existence of DGB has had the effect of chilling speech by Plaintiff AAPS, particularly in its conferences and on the internet; this interferes with the ability of AAPS to attract speakers and attendees, and to obtain donations from supporters who view presentations posted on the internet from AAPS's

---

[14] Examples of proposed legislation on this issue that were never enacted include the COVID-19 Disinformation Research and Reporting Act of 2021, S. 913, 117th Cong. (2021), and A Bill To Amend the Communications Act of 1934, S. 2448, 117th Cong. (2021).

conferences. (ROA.20, ¶ 42) The DGB was established as part of a partisan agenda of censorship, to act as a sort of "Ministry of Truth" disparagingly described in George Orwell's dystopian novel, *1984*. (ROA.21, ¶ 47)

Criticism of DGB was intense from both sides of the political spectrum, although misreported as being primarily from the political right; both Elon Musk and Jeff Bezos appeared to criticize the DGB, as have liberal politicians. (ROA.21-22, ¶ 48) For example, Jeff Bezos, who owns the liberal-leaning *Washington Post*, sarcastically tweeted against the DGB as follows:

> The newly created Disinformation Board should review this tweet [by Biden], or maybe they need to form a new Non Sequitur Board instead. Raising corp taxes is fine to discuss. Taming inflation is critical to discuss. Mushing them together is just misdirection.

(*Id.*)

### Homeland Security Advisory Council

The Homeland Security Advisory Council ("HSAC") is a FACA committee within DHS. (ROA.22, ¶ 49) HSAC is governed by its charter, and currently has about 36 members. (ROA.22, ¶ 50) The members of HSAC serve as Special Government Employees, a term defined in 18 U.S.C. § 202(a), and are employed entirely or nearly entirely in the private sector including nonprofit organizations. (ROA.22, ¶ 51)

The charter governing HSAC was approved by DHS on March 8 and filed with Congress on March 11, 2021. (ROA.22, ¶ 52) This HSAC charter requires

that its "membership shall be drawn from the following fields:

> Police, fire, emergency medical services, and public works;
> Public health;
> State, local, and tribal officials;
> National policy makers;
> Experts in academia and the research community; and
> Leaders from the private sector including, but not limited to, owners and operators of critical industries, resources, and infrastructure."[15]

(ROA.22, ¶ 53)

Accordingly, none of the members of HSAC is required by its charter to have any experience with First Amendment freedom of speech issues, social media, censorship on the internet, or addressing public "disinformation" however defined. (ROA.22-23, ¶ 54) Nothing in the charter of HSAC authorizes it to address First Amendment issues concerning freedom of speech, or censorship on the internet. The charter of HSAC limits it as an advisory body to providing only "organizationally independent, strategic, timely, specific and actionable advice to the Secretary and senior leadership on matters related to homeland security." (HSAC Charter § 3) (ROA.23, ¶ 55) The purpose of HSAC is plainly stated in its charter and primarily relates to "terrorist attacks, major disasters, or other emergencies" (HSAC Charter § 3(A)), a phrase that the HSAC Charter repeats multiple times.  (*Id.* § 3(A), (C), (D)).  The HSAC charter expressly and fully

---

[15] Charter of the DHS Homeland Security Advisory Council, https://www.dhs.gov/sites/default/files/publications/hsac_charter_renewal_508.pdf (viewed Sept. 9, 2023).

defines the purpose of HSAC as follows:

Objectives and Scope of Activities:

HSAC shall provide organizationally independent, strategic, timely, specific and actionable advice to the Secretary and senior leadership on matters related to homeland security. HSAC serves strictly as an advisory body with the purpose of providing advice upon the request of the Secretary. HSAC advice to the Secretary may encompass:

A. Strategy and Policy: Recommendations for the development of strategies and policies that will further the Department's ability to prevent, protect against, respond to, and recover from terrorist attacks, major disasters, or other emergencies.

B. Leadership and Coordination: Recommendations for improving the Department's leadership and coordination, internally across the Department, externally across the Federal Government, and among state, local, tribal governments, first responders, the private and non-profit sectors, academia, and research communities.

C. Management and Implementation: Recommendations for the development and implementation of specific programs or initiatives to prevent, protect against, respond to, and recover from terrorist attacks, major disasters, or other emergencies.

D. Evaluation and Feedback: Recommendations for the efficiency and effectiveness of Department of Homeland Security (DHS) programs to prevent, protect against, respond to, and recover from terrorist attacks, major disasters, or other emergencies.

(ROA.23-24, ¶ 56)

### Injury to AAPS

AAPS co-sponsors conferences and posts videos on the internet about issues in public controversy, including Covid-19, abortion, and positions taken by the Biden administration. (ROA.24, ¶ 57) Defendants' retaliation against speakers at

AAPS conferences injures AAPS and chills its First Amendment freedom of speech rights, which broadly include the right to listen and hear. (ROA.24, ¶ 58) Such censoring and disfavoring of its freedom of speech adversely affects AAPS and causes it a loss in financial support, in the form of decreased attendance at its conferences and reduced contributions to it. (ROA.24, ¶ 59) The establishment of the DGB within the powerful federal agency DHS had a chilling effect on internet speech disfavored by the Democratic Party, President Biden, and executives at the Board Defendants. (ROA.24, ¶ 60) The Board Defendants' foregoing conduct interferes with Plaintiff AAPS's business activities, and thereby impedes competition in the market of medical conferences and fundraising based on presentations posted on the internet. (ROA.32, ¶ 113)

Defendant Mayorkas's creation of the DGB and his order to the HSAC to provide a recommendation to him concerning the activities of the DGB constituted final agency actions within the meaning of the Administrative Procedure Act (APA). (ROA.29, ¶ 84) Yet Defendant Mayorkas has failed to make the related documents of HSAC available concerning its communications and activities with respect to the DGB, in violation of FACA. (ROA.30, ¶ 93)

**B.  Relevant Procedural History**

Plaintiff filed its Complaint on July 12, 2022. (ROA.8-35) Defendants

subsequently filed their motions to dismiss on September 26 and 27, 2022.

(ROA.107-267)

On May 16, 2023, the district court issued its Opinion and Order granting

the Board Defendants' motions to dismiss. (ROA.408-23) On May 23, 2023, the

district court rendered a separate Opinion and Order granting the government's

motion to dismiss (ROA.424-35) That fully disposed of this case below, and

accordingly the district court rendered a final judgment on that same day

terminating the entire case below. (ROA.436) Plaintiff timely filed its Notice of

Appeal on July 13, 2023. (ROA.437-38)

**C. Rulings Presented for Review**

The district court dismissed the claims against the Board Defendants, under

Fed. R. Civ. P. 12(b)(1), without reaching other grounds asserted by them for

dismissal. "As AAPS has failed to show Article III standing, all of its claims

against the board defendants are dismissed." (ROA.422) The court then declined to

assert jurisdiction over the remaining state law claims in the absence of a pending

federal claim. (*Id.*)

The district court found that there was a lack of standing for both Plaintiff

AAPS's claim under the First Amendment and its antitrust claim. As to the First

Amendment claim, the district court wondered whether the Fifth Circuit would recognize a right to listen: "The Fifth Circuit has not addressed the 'right to listen.'" (ROA.413) The district court then held that even if such a right is recognized by this Court, "there would still be no injury in fact [because a] precondition of asserting the right to listen is the existence of a willing speaker." (ROA.414) Plaintiff AAPS did identify Dr. Peter McCullough as a censored willing speaker, but the district court held as follows:

> AAPS does not identify any willing speakers. Although AAPS mentions Dr. Peter McCullough in its response, it alleges only that Dr. McCullough spoke at an AAPS conference and has been targeted—not that Dr. McCullough would speak differently at AAPS events if it were not for the threats he has received.

(ROA.414) The district court did not resolve whether the Board Defendants are subject to the First Amendment for allegedly "impos[ing] their censorship as alleged herein either at the request of officials in the Biden Administration and Democrats in Congress, or in the expectation of obtaining favoritism from them as a result" (ROA.28, ¶ 79), as that issue became unnecessary to the decision below.

On the antitrust claim by Plaintiff AAPS, the district court found a lack of standing based on antitrust injury. "In this case, the court begins and ends with antitrust injury," the lower court held, and "the board defendants, whether monopolies or not, do not compete with AAPS and are not purchasers or consumers of AAPS services." (ROA.415-16) The district court held that:

If the board defendants were to violate the antitrust laws, the resulting antitrust injury, if any, would befall either their consumers (the physicians) or their competitors (other board-certification organizations). AAPS—which fits in neither group—would not suffer an antitrust injury.

(ROA.416)

The district court further found a lack of traceability and redressability between the actions taken by the Board Defendants and any injury to Plaintiff AAPS. (ROA.419-22) The nub of its ruling on this point was this: "To the extent AAPS has been injured, however, it was independent third-party physicians, rather than the board defendants, who committed the injurious acts." (ROA.421, n.5) The court elaborated that:

> it is pure speculation that the board defendants' actions, rather than any other factors, caused the alleged harm. It is equally speculative that court action would redress AAPS's injury and increase or restore robust speech, conference attendance, internet traffic, and monetary income. It is just as plausible that the nonparty physicians would continue to make the same decisions that cause the alleged harm even if the court granted the requested relief.

(ROA.422)

As to Defendant Mayorkas, the district court granted his motion to dismiss under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction, and did not reach his motion with respect to Rule 12(b)(6). (ROA.435) In this Memorandum Opinion and Order by the lower court, it recounted the facts relevant to Mayorkas and the Disinformation Governance Board, and relied on the following for its decision:

On August 24, [2022,] the [HSAC] subcommittee issued its final report, concluding that there is "no need for a separate . . . [b]oard" to support the Department's "underlying work." That same day, the advisory council accepted the subcommittee's recommendation. Mayorkas then announced that he terminated the board and rescinded its charter.

(ROA.426, citations omitted) The district then found mootness on that basis:

"Mootness is dispositive here and fatal for the claims AAPS properly brings before

the court." (ROA.429) The above-reported termination of the DGB "gave AAPS

the precise relief that it requested—to 'disband,' 'permanently discontinue,' and

'abolish' the board," the district court held. (ROA.431, citations omitted)

"Mayorkas's disbandment of the board and revocation of its charter eliminated any

live case or controversy against him, making AAPS's claims moot," the court held.

(*Id.*)

The district court reasoned that "[t]he voluntary-cessation exception does not

apply here," in part because government is presumed to be acting in good faith

when it, in contrast with a private defendant, voluntarily terminates an

objectionable activity. (ROA.433) The fact that government has indicated its

determination to continue to combat what it considers to be misinformation and

disinformation was unpersuasive to the court, which held that it:

> does not show that Mayorkas and the Department *will* re-establish the board; it merely demonstrates their *ability* to do so. That, by itself, is insufficient to prove the voluntary-cessation exception.

(*Id.*, emphasis in original)

The government's own statements, as quoted by AAPS in its opposition to Mayorkas's motion to dismiss, showed that the government had merely dispersed its misinformation campaign to multiple offices rather than consolidating them all in the DGB. The district recognized this but nevertheless treated these as new allegations and refused to consider them:

> AAPS did not make any of these allegations in its complaint or seek relief for the Department's generalized role in attacking disinformation.

(ROA.434)

Finally, the district court denied AAPS leave to amend its Complaint, based on the following:

> It will not allow leave to amend here. Under this court's local procedures, AAPS—who is represented by private counsel—was afforded an opportunity to amend. Gal. Div. R. Prac. 6. Additionally, allowing AAPS to amend would be futile, cause undue delay, and unfairly prejudice Mayorkas. Finally, AAPS made no attempt to explain its delay in raising these new allegations and did not file a motion seeking leave to amend its complaint.

(ROA.434, n.2) The Galveston Division Rules of Practice are available online.[16]

In its opinion the district court recognized that AAPS asserted a claim that Mayorkas had failed to make documents available to the public as required by the FACA. (ROA.427, citing the Complaint) But the court dismissed that claim without providing a reason.

---

[16] https://www.txs.uscourts.gov/sites/txs/files/GalvestonDistrictCourtRulesofPractice.pdf (viewed Sept. 9, 2023).

## SUMMARY OF ARGUMENT

The district court erred by failing to recognize the First Amendment right to hear, and the existence of standing to challenge censorship that interferes with that fundamental right. Amid the current national climate of increasing censorship, it is particularly necessary at this time not to prematurely dismiss lawsuits against it, as the district court did in dismissing this on standing grounds. Censorship today comes in a variety of new and devious schemes, and causes of action against it like this one should not be dismissed without allowing even a factual record to develop. The First Amendment of the U.S. Constitution safeguards against the censorship by government and the retaliation by the Board Defendants here for policy statements with which they may disagree. *See* U.S. CONST. amend. I.

The lower court erred further in using a more-likely-than-not factual standard to dismiss this lawsuit on the pleadings, in the court's analysis of traceability and redressability. Pleadings are to be taken as true, with all inferences taken in favor of the plaintiff, unless they are wholly implausible. But an incorrect legal standard used below relied on premature factual speculation by the court about the effects of Defendants' censorship on Plaintiff AAPS.

The district court erroneously dismissed the antitrust claim against the abuse of monopoly power by the Board Defendants, by limiting the scope of antitrust injury to only consumers and competitors. While some seek to narrow antitrust law

to the protection only of consumers and competitors, that has never been adopted by the Supreme Court or this Circuit. Instead, a precedent relied on heavily below states that actionable antitrust injury extends beyond those categories of victims. Abuse of monopoly power can harm far more than consumers and competitors, and antitrust injury exists for all those injured by misuse of monopoly power, to challenge it.

As to the dismissal below on mootness grounds, the federal government disbanded its Disinformation Governance Board because its censorship activities have been dispersed to other groups. That does not satisfy the requirement for a defendant to prevail based on mootness. The presumption of good faith by the government upon which the district court relied below is inapplicable where, as here, there has been an ongoing pattern of determined censorship activities by a partisan administration in office.

FACA applies and was a central part of Plaintiff AAPS's claims below against Defendant Mayorkas, yet the district court never addressed the failure by Mayorkas to provide the transparency that FACA requires. Key documents continue to be withheld by the federal government concerning its censorship efforts, in violation of FACA.

Finally, the unusual Galveston Division Local Rule 6 was applied here to preclude amending the Complaint even once. This rule is contrary to the

controlling Federal Rules of Civil Procedure and the precedents of this Fifth

Circuit. In light of how the Biden administration dispersed the DGB during this

litigation, the denial below based on this local rule of the request by Plaintiff

AAPS to amend its pleadings was an abuse of discretion. Facts which the district

court expressly declined to consider could have been easily pled in an amended

pleading, and Plaintiff AAPS should have been allowed to do so.

## ARGUMENT

### I.  **Standard of Review.**

Review is *de novo* here, because the dismissal below was based on FED. R.

CIV. P. 12(b)(1). As the Fifth Circuit has established:

> A district court's dismissal for lack of subject matter jurisdiction pursuant
> to Rule 12(b)(1) or for failure to state a claim pursuant to Rule 12(b)(6) is
> reviewed de novo. *Ballew v. Cont'l Airlines, Inc.*, 668 F.3d 777, 781 (5th
> Cir. 2012); *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011). Legal
> questions relating to standing and mootness are also reviewed de
> novo. *Envtl. Conservation Org. v. City of Dallas*, 529 F.3d 519, 524 (5th
> Cir. 2008); *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 659
> (5th Cir. 2006).

*Ctr. for Biological Diversity v. BP Am. Prod. Co*, 704 F.3d 413, 421-22 (5th Cir.

2013). *See also NRA of Am., Inc. v. McCraw*, 719 F.3d 338, 343 (5th Cir. 2013)

("This court reviews questions of standing *de novo*.") (citing *NAACP v. City of*

*Kyle, Tex.*, 626 F.3d 233, 236 (5th Cir. 2010)).

As to the Galveston Division Local Rule 6 that precludes leave to amend a

complaint once it has been dismissed, and prevents amendment even soon after a

motion to dismiss has been filed, "[t]he validity of a local court rule presents an issue of law to be determined *de novo* on appeal." *Barbosa v. Cty. of El Paso*, No. 97-51098, 1998 U.S. App. LEXIS 39641, at *5 (5th Cir. Sep. 8, 1998) (quoting *Ashland Chem. Inc. v. Barco Inc*., 123 F.3d 261, 263 (5th Cir. 1997)).

## II.     The District Court Erred in Failing to Recognize the First Amendment Right to Hear, and in Construing Too Narrowly Standing Under the First Amendment to Assert This Right.

"It is not hard to sustain standing for a pre-enforcement challenge in the highly sensitive area of public regulations governing bedrock political speech." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 331 (5th Cir. 2020) (Jones, J.). Standing exists in challenges, as here, to censorship of political speech due to "the very special nature of political speech itself." *Id.* (quoting *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 660 (5th Cir. 2010), inner quotations omitted). Other Circuits fully concur about this uniquely undemanding standing threshold for challenging infringement on speech. *See, e.g., Vitagliano v. Cty. of Westchester*, 71 F.4th 130, 140 & n.5 (2d Cir. 2023) (adopting the foregoing *Speech First* precedent and citing other Circuits and the Supreme Court for the same principle); *Ariz. Right to Life PAC v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003) (a plaintiff who was compelled to change political behavior had standing); *Majors v. Abell*, 317 F.3d 719, 721 (7th Cir. 2003) (Posner, J.) (if a statute even "arguably covers" plaintiff's speech, "and so may deter

constitutionally protected expression ..., there is standing") (citing *Virginia v. Am. Booksellers' Ass'n, Inc.*, 484 U.S. 383, 392-93 (1988)).

Plaintiff easily satisfies the requirement for standing as reiterated by this Court in *Speech First*. Generally, "[t]o have standing, a plaintiff must (1) have suffered an injury in fact, (2) that is fairly traceable to the challenged action of the defendant, and (3) that will likely be redressed by a favorable decision." *Id.* at 330 (quoting *Lujan v. Def's of Wildlife*, 504 U.S. 555, 560-61 (1992)). The test for injury-in-fact under this analysis is as follows:

> A plaintiff has suffered an injury in fact if he (1) has an "intention to engage in a course of conduct arguably affected with a constitutional interest," (2) his intended future conduct is "arguably ... proscribed by [the policy in question]," and (3) "the threat of future enforcement of the [challenged policies] is substantial."

*Speech First*, 979 F.3d at 330 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161-64 (2014)). Plaintiff satisfies all three of these requirements of standing under the relaxed standard of the First Amendment.

## A.    The District Court Erred in Overlooking that this Fifth Circuit Has Recognized a First Amendment Right to Hear.

"The First Amendment protects the right to hear as well as to speak." *Basiardanes v. Galveston*, 682 F.2d 1203, 1211 (5th Cir. 1982) (quoting *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Counsel, Inc.*, 425 U.S. 748 (1976)). "The First Amendment, applicable to a state university through the Fourteenth Amendment, embraces the right to hear." *Brooks v. Auburn Univ.*, 412

F.2d 1171, 1172 (5th Cir. 1969) (citing *Martin v. City of Struthers*, 319 U.S. 141 (1943); *Lamont v. Postmaster General*, 381 U.S. 301 (1965)).

Despite this, the district court mistakenly held that this Fifth Circuit has never recognized a constitutional right to listen. (ROA.413-14) Plaintiff AAPS's case is based on this constitutional right to listen, as it expressly alleged in its Complaint. (ROA.24, ¶ 58) Plaintiff AAPS holds medical conferences that depend directly on a robust debate of controversial medical issues, including presentations that are disfavored by Defendants but which are constitutionally protected free speech. Plaintiff AAPS is impeded from holding their conferences if Defendants are allowed to infringe on the constitutional right to hear. Recognition of this First Amendment right is essential to adjudicating this dispute. Yet the district court erred on this fundamental legal point.

### B.    Plaintiff AAPS Has Standing to Object to the Infringement on Its First Amendment Right.

As to the threshold injury-in-fact requirement, the Fifth Circuit "has repeatedly held, in the pre-enforcement context, that '[c]hilling a plaintiff's speech is a constitutional harm adequate to satisfy the injury-in-fact requirement.'" *Houston Chronicle v. City of League City*, 488 F.3d 613, 618 (5th Cir. 2007) (quoting *Meese v. Keene*, 481 U.S. 465, 473 (1987)). *See also Freedom Path, Inc. v. I.R.S.*, 913 F.3d 503, 507 (5th Cir. 2019) (same); *Fairchild v. Liberty ISD*, 597 F.3d 747, 754-55 (5th Cir. 2010) (same); *Carmouche*, 449 F.3d at 660 ("As the

district court noted, the First Amendment challenge has unique standing issues

because of the chilling effect, self-censorship, and in fact the very special nature of

political speech itself.") (inner quotations omitted).

The Board Defendants threaten career-ending revocation of board

certification based on disagreement with what a physician says at a conference

held by Plaintiff AAPS, and elsewhere. Where "the threat of future enforcement …

is substantial," then standing exists under the First Amendment. *Speech First*, 979

F.3d at 330 (inner quotations omitted). This threat of retaliation by the Board

Defendants is confirmed by their postings on their own websites. (ROA.18, ¶ 34;

ROA.19, ¶ 39) Under the current political and legal climate of insatiable

censorship of politically disfavored views, these threats by the Board Defendants

should not be downplayed. As emphasized by the unanimous decision of this Court

in *Speech First*:

> In our current national condition, … courts must be especially vigilant
> against assaults on speech in the Constitution's care. Otherwise, the people
> may not be free to generate, debate, and discuss both general and specific
> ideas, hopes, and experiences, to transmit their resulting views and
> conclusions to their elected representatives, to influence the public policy
> enacted by elected representatives, and thereby to realize the political and
> human common good.

*Speech First*, 979 F.3d at 339 (inner quotations and footnotes omitted). *See also*

*Abraugh v. Altimus*, 26 F.4th 298 (5th Cir. 2022) (reversing a dismissal based on

standing, even outside of the relaxed standard of the First Amendment).

Inseparable from the speech at issue here are elements of political speech about public policy, to which the Supreme Court has extended special protection and invalidated nearly everything that interferes with it:

> political speech must prevail against laws that would suppress it, whether by design or inadvertence. Laws that burden political speech are 'subject to strict scrutiny,' which requires the Government to prove that the restriction "furthers a compelling interest and is narrowly tailored to achieve that interest." *[FEC v. Wis. Right to Life, Inc.* ("*WRTL*"), 551 U.S. 449, 464 (2007)] (opinion of Roberts, C. J.).

*Citizens United v. FEC*, 558 U.S. 310, 340 (2010).

Moreover, this Fifth Circuit has extended the relaxed requirement of standing under the First Amendment to non-political speech. "While it is true that *Speech First* involved political speech—which is generally ***entitled to heightened constitutional protection***, *see Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 207-08 (1999) (Thomas, J., concurring) (collecting cases)—neither Supreme Court nor Fifth Circuit precedent limits this rule to political speech claims." *Barilla v. City of Hous.*, 13 F.4th 427, 432 n.2 (5th Cir. 2021) (citing *Babbitt v. UFW Nat'l Union*, 442 U.S. 289, 301-02 (1979); *Speech First*, 979 F.3d at 335, emphasis added). The core value underlying the Free Speech Clause of the First Amendment is the "public interest in having free and unhindered debate on matters of public importance." *Pickering v. Bd. of Educ. of Township High Sch. Dist. 205, Will County, Ill.*, 391 U.S. 563, 573 (1968). The

allegations by Plaintiff AAPS of Defendants infringing on this core value of free speech should not have been prematurely dismissed below.

### C. It Is Unnecessary to Reach the Issue of Whether the Board Defendants Are State Actors, But If This Issue Is Addressed then State Action by the Board Defendants Should Be Found.

Lurking below the surface in this case is whether the Board Defendants are state actors for the purpose of Plaintiff AAPS's First Amendment claim, but that requires factual development not yet allowed below, and the district court did not address this issue. To avoid any possibility of affirmance by a factual finding by this Court on this issue, Plaintiff AAPS briefly explains why the Board Defendants are state actors here.

With respect to social media, this Court very recently reiterated that "state action is essentially a factual determination made by sifting facts and weighing circumstances case by case to determine if there is a sufficient nexus between the state and the particular aspect of the private individual's conduct which is complained of." *Missouri v. Biden*, No. 23-30445, Slip op. 39-40 (5th Cir. Sept. 8, 2023) (cleaned up, citation omitted). Here there are immense government-conferred benefits sought for and obtained by the Board Defendants:

> The Board Defendants have lobbied for and sometimes obtained government endorsement of their certifications at the federal level. The Board Defendants have also sought and sometimes obtained, at the state level, government restrictions on physicians against referring to themselves as "board certified" unless certified by the Board Defendants.

(ROA.28, ¶ 78)

In *Norwood v. Harrison*, government support in the form of loaning textbooks to private schools was sufficient to make them state actors despite their assertion of being merely private entities. 413 U.S. 455 (1973). Here, the Board Defendants fit comfortably within the categories recognizing private conduct as state action. In *Richard v. Hoechst Celanese Chem. Grp., Inc.*, the Fifth Circuit held that:

> This Court has previously outlined the various tests that the Supreme Court employs to determine whether a private party has acted under color of state law. *Bass v. Parkwood*, 180 F.3d 234, 241-43 (5th Cir. 1999) (applying the tests to hold that a private mental institution did not act under color of state law by committing the plaintiff). According to the ***public function test***, a private entity acts under color of state law when the entity performs a function which is "exclusively reserved to the state." *Flagg Bros.*, 436 U.S. at 157-58. (internal quotations omitted); *Wong v. Stripling*, 881 F.2d 200, 202 (5th Cir. 1989). The ***state compulsion (or coercion) test*** holds the state responsible "for a private decision only when [the state] has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Blum v. Yaretsky*, 457 U.S. 991, 1004, 73 L. Ed. 2d 534, 102 S. Ct. 2777 (1982) (internal quotations omitted). Similarly, the ***nexus or state action test*** finds state action where the state has "so far insinuated itself into a position of interdependence with the [private actor] that it was a joint participant in the enterprise." *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 357-58, 42 L. Ed. 2d 477, 95 S. Ct. 449 (1974); *see also Lugar*, 457 U.S. at 941-42 (1982).

*Richard v. Hoechst Celanese Chem. Grp.*, 355 F.3d 345, 352 (5th Cir. 2003) (emphasis added).

The Board Defendants are the equivalent of state actors under each of the above three tests. The factual allegation of board certification being necessary for a physician to practice fully in his specialty is widely recognized, and the Board Defendants' attempt to deny that should be rejected. (ROA.11, ¶ 8; ROA.28, ¶ 81; ROA.31, ¶ 108)  Citations to factual assumptions to the contrary in other district court decisions are inappropriate here. *See, e.g.*, *Allyn v. Am. Bd. of Med. Specialties, Inc.*, Case No: 5:18-cv-355-Oc-30PRL, 2019 WL 297459, at *6 (M.D. Fla. Jan. 3, 2019), *adopted at* 2019 WL 293277 (M.D. Fla. Jan. 23, 2019) (cited by the Board Defendants below for the misleading presumption that they "do not control the consequences of [hospitals'] credentialing decisions").

As to the public function test, the Board Defendants behave as *de facto* state regulators, and are perceived and portrayed in that manner by the medical literature. *See* Michael DePeau-Wilson, "Regulators [including ABIM] Move Against Two 'Misinformation' Doctors," *MedPage* (November 1, 2022).[17] The recent Fifth Circuit decision of *NetChoice v. Paxton* further forecloses the outdated public/private approach that is sought by the Board Defendants. 49 F.4th 439 (5th

---

[17] https://www.medpagetoday.com/special-reports/exclusives/101529 (viewed Sept. 9, 2023).

Cir. 2022). The Board Defendants' monopolies are akin to the "monopoly" over a

shopping mall, which the U.S. Supreme Court held could be prohibited from

censoring speech on its private land:

> The views expressed by members of the public in passing out pamphlets or
> seeking signatures for a petition thus will not likely be identified with those
> of the owner. Second, no specific message is dictated by the State to be
> displayed on appellants' property. … [A]s far as appears here appellants can
> expressly disavow any connection with the message by simply posting signs
> in the area where the speakers or handbillers stand. Such signs, for example,
> could disclaim any sponsorship of the message and could explain that the
> persons are communicating their own messages by virtue of state law.

*Pruneyard Shopping Ctr. v. Robins*, 447 U.S. 74, 87 (1980) (relied on heavily by

the Fifth Circuit in *NetChoice v. Paxton*, as the panel majority cited it about 20

times). Like a shopping mall, the Board Defendants can easily disavow an opinion

expressed by a physician to the public.

The state coercion test requires merely "significant encouragement" by ***any***

government entity, state or federal, and not necessarily by Defendant Mayorkas.

The state-funded and state-controlled Federation of State Medical Boards

("FSMB") issued, on July 29, 2021, an announcement demanding punishment of

outspoken physicians.[18]  The FSMB is comprised of state governmental entities,

which significantly encouraged the Board Defendants' actions, thereby making

them state actors under the state coercion test. Defendants ABIM and ABFM

---

[18] FSMB Statement, https://www.fsmb.org/advocacy/news-releases/fsmb-spreading-covid-19-vaccine-misinformation-may-put-medical-license-at-risk/ (viewed Sept. 9, 2023).

issued their statement about taking action against physicians for alleged

misinformation less than six weeks after the FSMB's statement, and Defendants

ABIM and ABFM expressly recognized in their statements the encouragement by

the FSMB:  "The Federation of State Medical Boards (FSMB), which supports its

member state medical licensing boards, has recently issued a statement saying that

providing misinformation about the COVID-19 vaccine …."  Joint Statement on

Dissemination of Misinformation (Sept. 9, 2021).[19]  Less than three weeks later,

Defendant ABOG did likewise, also citing the state-funded and state-controlled

FSMB as its encouragement.  Statement Regarding Dissemination of COVID-19

Misinformation (Sept. 27, 2021).[20] The state-funded FSMB also maintains an

entire website that invites the public to search on the name of any physician in the

country, and be told by the FSMB whether the physician is board certified or not

by the Board Defendants.[21]

    This Court need not reach the issue of state action by the Board Defendants

but, if this issue is addressed, then it should be decided at this preliminary stage in

favor of Plaintiff AAPS.

---

[19] Joint Statement on Dissemination of Misinformation (Sept. 9, 2021) https://www.abim.org/media-center/press-releases/joint-statement-on-dissemination-of-misinformation/ (viewed Sept. 9, 2023).
[20] https://www.abog.org/about-abog/news-announcements/2021/09/27/statement-regarding-dissemination-of-covid-19-misinformation (viewed Sept. 9, 2023).
[21] Docinfo by the FSMB, https://www.docinfo.org/ (viewed Sept. 9, 2023).

### III.  The District Court Prematurely Dismissed the Claims Against the Board Defendants Based on Its Own Speculation about Traceability and Redressability.

The analysis by the district court in rejecting the existence of traceability and redressability could have been procedurally appropriate after a bench trial or on a motion for summary judgment, but not on the motion to dismiss below. The district court held, "This court, too, is reluctant to find standing based on AAPS's speculation about the decisions and unspoken thoughts of independent, nonparty physicians." (ROA.420) The district concluded that "AAPS has failed to ***carry its burden***." (ROA.422) (emphasis added).

There is no "burden" for Plaintiff AAPS to carry on this issue at this preliminary pleading stage. AAPS does not have to prove its case at this point, or even show its cards. All that AAPS need do – and all it should do in order protect against retaliation against physicians – is to plead enough to put Defendants on notice of the nature of the injury to Plaintiff AAPS. *See, e.g.*, *Edmiston v. Borrego*, 75 F.4th 551, 561 (5th Cir. 2023) ("Accepting the well-pleaded allegations as true and drawing reasonable inferences in plaintiffs' favor …."). This injury is not alleged to be large, and it does not need to be large to establish standing. Even a small chilling effect is actionable injury under the First Amendment.

There is nothing implausible about alleging that the censorship actions by Defendants is chilling speech at Plaintiff's AAPS conferences. At the pleading

stage, a complaint is not required to prove its case, and should not be dismissed

unless the allegations are utterly implausible. The district court did not find

implausible that Defendants' censorship might have their intended effect. In fact,

the district could found nothing implausible in Plaintiff AAPS's Complaint. The

"the decisions and unspoken thoughts of independent, nonparty physicians" are

what the discovery phase of a lawsuit exists to prove or disprove, and should not

be resolved at the outset by dismissing a complaint against censorship.

The district court held, while improperly imposing a burden of proof on

Plaintiff AAPS at the pleading stage, that:

> It is just as plausible that the nonparty physicians would continue to make
> the same decisions that cause the alleged harm even if the court granted the
> requested relief.

(ROA.422) But that observation by the district court confirms that the dismissal

below of the pleading was incorrect. By finding that there are two plausible

alternatives, one establishing traceability and redressability and one not, the district

court thereby found that Plaintiff AAPS's allegations are just as plausible as

Defendants' denial of them. That "just as plausible" finding negates the basis for

dismissal, and discovery should have proceeded for fact-finding.

### IV. Antitrust Injury Is Not Limited to Consumers and Competitors, and the District Court Erred in Dismissing on This Basis.

In its Complaint, Plaintiff AAPS alleges that the Board Defendants hold a

monopoly in their respective specialties for board certification (ROA.9, ¶ 2;

ROA.10-11, ¶ 6; ROA.31, ¶ 107; ROA.32, ¶¶ 110, 114-15), and are misusing their monopoly. (ROA.8-9, ¶¶ 1, 6; ROA.32, ¶ 110) AAPS thereby alleges the central elements of a Sherman Act Section 2 claim. *See United States v. S. Motor Carriers Rate Conference, Inc.*, 672 F.2d 469, 484 (5th Cir. 1982) ("Both the possession of monopoly power and its willful misuse are necessary to sustain a charge of illegal monopolization under Section 2 of the Sherman Act."). This is a Section 2 rather than a Section 1 Sherman Act claim, and thus there need not be any conspiracy or unlawful agreement. *See* 15 U.S.C. § 2. A misuse of a monopoly by one and only one entity suffices as a violation.

The district court dismissed this claim based on antitrust injury (ROA.415), but precedent is against resolving the fact-intensive issue of antitrust injury on the pleadings. *See, e.g.*, *Brader v. Allegheny Gen. Hosp.*, 64 F.3d 869, 876 (3d Cir. 1995) ("[T]he existence of an 'antitrust injury' is not typically resolved through motions to dismiss."). The district court was persuaded by the Board Defendants' argument that antitrust laws are limited to the protection of consumers, purchases, and competitors. (ROA.416) In fact, to the best of undersigned counsel's knowledge, neither the U.S. Supreme Court nor the Fifth Circuit or any district court within this Circuit has ever limited the scope or purpose of antitrust laws to only advancing consumer welfare. A Supreme Court observation that consumers have a right to sue for antitrust violations is not a limitation of antitrust causes of

action to consumers or their interests. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979) ("[T]o the extent that the legislative history is relevant, it supports our holding that a consumer deprived of money by reason of allegedly anticompetitive conduct is injured in 'property' within the meaning of § 4" of the Clayton Act).

The Board Defendants abuse their monopoly power by acting "in an unreasonably exclusionary manner," namely by threatening to revoke board certifications of physicians based on disagreements with their public statements. *See United States v. S. Motor Carriers Rate Conference*, quoted *supra*. It is the "exclusionary" effect that is the touchstone of this type of violation of antitrust laws, because that reduces economic output and that effect is virtually always harmful. The district court avoids reaching the harm caused by the Board Defendants' exclusionary conduct, however, by holding that this "goes to whether there is an antitrust violation, not to the existence of an antitrust injury." (ROA.417).

Yet nothing in the precedents limit standing to consumers or competitors when a misuse of a monopoly under Sherman Act Section 2 is an antitrust violation that causes harm. The district court relied primarily on a decision by this Court which, in fact, emphasized the opposite of how the court below ruled. The district court held that:

> In this case, the court begins and ends with antitrust injury. "Typically, parties with antitrust injury are either competitors, purchasers, or consumers

40

in the relevant market." *Waggoner v. Denbury Onshore, LLC*, 612 F. App'x 734, 737 (5th Cir. 2015). The crux of the antitrust-injury matter here is simple—the board defendants, whether monopolies or not, do not compete with AAPS and are not purchasers or consumers of AAPS services. Typically, that means that AAPS did not suffer antitrust injury—and AAPS makes no convincing argument otherwise. Threats to independent physicians are not anti-competitive actions in the context of the relationship between the board defendants and AAPS.

(ROA.415-16)

But that is not what *Waggoner* held. Instead, this Fifth Circuit emphasized in

*Waggoner* that:

> Typically, parties with antitrust injury are either competitors, purchasers, or consumers in the relevant market. *See, e.g.*, John J. Miles, 1 *Health Care and Antitrust Law* § 9:7 & n.30 (2014) (collecting cases). ***But standing is not necessarily limited to this group***. *See Blue Shield of Va. v. McCready*, 457 U.S. 465, 472, 102 S. Ct. 2540, 73 L. Ed. 2d 149 (1982) ("As we have recognized, '[§ 4 of the Clayton Act] ***does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers*** . . . .'" (quoting *Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219, 236, 68 S. Ct. 996, 92 L. Ed. 1328 (1948) (alteration in original)); *cf. Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 112, 107 S. Ct. 484, 93 L. Ed. 2d 427 (1986) (extending the antitrust injury requirements of Clayton Act § 4 claims for damages to § 16 claims for injunctive relief).

*Waggoner v. Denbury Onshore, L.L.C.*, 612 F. App'x 734, 737 (5th Cir. 2015)

(emphasis added).

The outcome in *Waggoner*, which was an unpublished decision, was based

on this Court's recognition that "we have explicitly held that a royalty-interest

owner's alleged injury of decreased royalty payments due to a conspiracy among

oil companies is not antitrust injury." *Id.* at 738. Nothing remotely similar to that is at issue here.

The district court distinguished multiple precedents cited by Plaintiff AAPS below on the grounds that AAPS is not a competitor of the Board Defendants, which is not directly refusing to deal with AAPS. But the Board Defendants are threatening to exclude physicians who make disfavored statements at Plaintiff AAPS's conferences and in other public venues. In essence, the Board Defendants are thereby refusing to deal with physicians who participate in Plaintiff AAPS's conferences. A victim of such a refusal to deal has antitrust injury to challenge it, as the cases cited by Plaintiff AAPS below held. *See, e.g.*, *Lorain Journal Co. v. United States*, 342 U.S. 143, 154 (1951) (when the only newspaper in town refused to accept advertising from local merchants who also advertised on a new radio station, the Supreme Court held that was illegal under Sherman Act Section 2, and antitrust injury was not limited to the merchants themselves).

The ruling below, if adopted, would allow far too much abuse of monopoly power by the Board Defendants as they pursue an ideological agenda. Indeed, several Board Defendants have even threatened revocation of their board certification based merely on how a physician testifies at a legislative hearing, which directly undermines our democratic process. *See Sambrano v. United Airlines, Inc.*, 45 F.4th 877, 883 (5th Cir. 2022) (Ho, J., concurring in the denial of

rehearing en banc) (decrying the misuse of market power by corporations to interfere with the ability of citizens to speak out, thereby undermining our democratic process).

## V. The Claim against Mayorkas Is Not Moot Because Government's Improper Censorship Activities Have Not Stopped, and There Remains the Unresolved FACA Violation.

### A. This Action Is Not Moot Because the Government Merely Dispersed Its Censorship Activities among Other Government Employees.

By its own public admission, the Biden administration merely dispersed the censorship work of the DGB to other offices within the government. While the government argues that its disbanding of the DGB establishes mootness, Fifth Circuit authority stands against finding mootness here:

> "'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice,' even in cases in which injunctive relief is sought." *Meza v. Livingston*, 607 F.3d 392, 399-400 (5th Cir. 2010) (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283 (1982)). That general rule is not absolute, but "[v]oluntary cessation of challenged conduct" moots a case "only if it is 'absolutely clear that the allegedly wrongful behavior could not be reasonably expected to recur.'" *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 222 (2000) (quoting *United States v. Concentrated Phosphate Exp. Ass'n*, 393 U.S. 199, 203 (1968)).

*Speech First, Inc. v. Fenves*, 979 F.3d 319, 328 (5th Cir. 2020) (cleaned up).

This Fifth Circuit requirement of absolute clarity of cessation is plainly lacking here. The very same document on which the government relied below for its mootness argument contains the bold call by government for "a more strategic

approach to disinformation," such that "DHS 'develop a unified strategy to counter disinformation campaigns that appear in social media.'" (Subcommittee Final Report at 6 & n.1, citing DHS Needs a Unified Strategy to Counter Disinformation Campaigns, No. OIG-22-58, DHS Inspector General (Aug. 10, 2022)).[22] Indeed, Defendant Mayorkas adopted this position "that there is no need for a ***separate*** Disinformation Governance Board. But it is our assessment that the underlying work of Department components on this issue is critical." Subcommittee Final Report at 12 (emphasis added), adopted by Defendant Mayorkas. *See* n.1, *supra*. The work planned for the DGB has not ceased, but has merely been dispersed among other groups within DHS for which its Secretary, Defendant Mayorkas, should remain legally accountable in his official capacity.

The decision below relied on *Sossamon v. Lone Star State of Texas*, but that ruling narrowed the "presumption of good faith" in cessation of something objectionable to where it is applicable only "[w]ithout evidence to the contrary." 560 F.3d 316, 325 (5th Cir. 2009), *aff'd sub nom. Sossamon v. Texas*, 563 U.S. 277 (2011). *See also Ragsdale v. Turnock*, 841 F.2d 1358, 1365 (7th Cir. 1988) ("[S]uch self-correction [by a government defendant] provides a secure foundation for a dismissal based on mootness so long as it appears genuine.").

---

[22] https://perma.cc/M9H6-C6XX, linking to
https://www.oig.dhs.gov/sites/default/files/assets/2022-08/OIG-22-58-Aug22.pdf
(viewed Sept. 8, 2023).

The "evidence to the contrary" is abundant here, and was below. For

example, as submitted below, on November 2, 2022, the White House press

secretary responded as follows at a press conference:

> "There was reporting in The Intercept about opportunities for the federal government to identify for social media companies different posts that contained what was perceived as misinformation about the origins of COVID, the vaccine, other things as well …," [RealClearPolitics reporter Philip] Wegmann said.

> "I'll say this," Jean-Pierre replied, "The administration — the Biden administration remains fully committed to our mission to protect the security and resilience of our elections and safeguard election infrastructure. That includes combating disinformation."

> Jean-Pierre stressed that the Biden administration's efforts to fight allegedly false information on the internet predated the disastrous April rollout of the Department of Homeland Security's since-disbanded Disinformation Governance Board. …

> "So you are flagging misinformation?" Wegmann asked.

> "I don't have anything more to add. ***This is a Department of Homeland Security [matter] that I would refer you to***," she said without an explicit denial.

Steven Nelson, "Feds keep Facebook censorship portal despite DHS

Disinformation Board demise," *New York Post* (Nov. 2, 2022) (emphasis added).[23]

President Biden and she made similar comments two days later. Allie Malloy and

---

[23] https://nypost.com/2022/11/02/white-house-insists-its-not-using-facebook-censorship-portal/ (viewed Sept. 9, 2023).

Arlette Saenz, "Biden calls out Elon Musk and Twitter at Chicago-area fundraiser," *CNN* (Nov. 4, 2022).[24]

Defendant Mayorkas's termination of the DGB is simply not reassuring enough, because it incorporates the continue-against-disinformation recommendation by the Homeland Security Advisory Council Disinformation Best Practices and Safeguards Subcommittee Final Report (August 24, 2022) ("[I]t is our assessment that the underlying work of Department components on this issue is critical. ***The Department must be able to address the disinformation threat streams that can undermine the security of our homeland***.") (emphasis in original).[25]

Yet the district court refused to considered this, by characterizing it as new allegations not in the original Complaint. (ROA.434) ("Accordingly, the court will not consider these new allegations now.") In fact, these are not merely allegations but are admissions by the government cited in its own motion to dismiss. Moreover, a complaint is not required to anticipate a defense of mootness and assert allegations to overcome that defense. Plaintiff AAPS rebutted the government's argument of mootness by presenting undisputed facts incorporated

---

[24] https://www.cnn.com/2022/11/04/politics/joe-biden-elon-musk-twitter/index.html (viewed Sept. 9, 2023).
[25] https://perma.cc/M9H6-C6XX (viewed Sept. 9, 2023).

by the government into its own motion. It was a reversible error for the district court to refuse to consider this.

### B. A Remand Is Necessary so that Plaintiff AAPS Can Pursue Its Valid FACA Claim.

The Homeland Security Advisory Council (HSAC) has been co-chaired by the privately employed individuals, and thus is subject to FACA which broadly applies to advisory committees as follows:

> FACA defines the term 'advisory committee' to cover 'any committee, board, commission, council, conference, panel, task force, or other similar group, or any subcommittee or other subgroup thereof' that is 'established or utilized by' the President or a federal agency 'in the interest of obtaining advice or recommendations for' the President or the agency."

*Elec. Privacy Info. Ctr. v. Drone Advisory Comm.*, 995 F.3d 993, 996 (2021)) (quoting 5 U.S.C. app. 2, § 3(2)). The government conceded below that Plaintiff AAPS has standing to assert its section 10(b) FACA claim, because it does not require proof of any injury-in-fact. *See Public Citizen v. U.S. Dep't of Just.*, 491 U.S. 440, 450 (1989)).

The government sought below to evade FACA by arguing that it was the Subcommittee that advised HSAC, which advised Defendant Mayorkas. Yet the evidence shows that Defendant Mayorkas immediately adopted the Subcommittee Final Report on the very same day that the Subcommittee issued it, and Defendant Mayorkas even expressly embraced these "recommendations as a guide [for the

Department.]"[26] There is no evidence that HSAC ever actually considered and adopted the Subcommittee Final Report.

Defendant Mayorkas directly adopted the Subcommittee Final Report, which triggers the application of FACA to the Subcommittee because it thereby directly advised the Secretary. As the D.C. Circuit explained about FACA:

> But "[i]f a subcommittee makes recommendations directly to a Federal officer or agency, or if its recommendations will be adopted by the parent advisory committee without further deliberations by the parent advisory committee, then the subcommittee's meetings must be conducted in accordance with all openness requirements" of FACA.

*Elec. Privacy Info. Ctr.*, 995 F.3d at 999 (quoting 41 C.F.R. § 102-3.145). FACA applies because Defendant Mayorkas adopted the Subcommittee recommendations "without further deliberations" by HSAC.

Members of DHS and the HSAC Subcommittee, which cited its numerous interactions with DHS staff, constituted a working group "partially of federal officials and agency members themselves and was not subordinate to any other formalized decision-making body." *Pub. Emps. for Env't Responsibility v. Nat'l Park Serv.*, Civil Action No. 19-3629 (RC), 2022 U.S. Dist. LEXIS 93204, at *52 (D.D.C. May 24, 2022). FACA applies and Defendant Mayorkas has not cured the

---

[26] *See* DHS Statement, "Following HSAC Recommendation, DHS terminates Disinformation Governance Board" (Aug. 24, 2022). https://perma.cc/4WVL-Y3D2 (viewed Sept. 9, 2023).

violation by any formal notice-and-comment procedure that might have allowed for public participation. *See id.* at *54.

Plaintiff alleged below that the government has violated FACA's "fairly balanced" requirement "with respect to First Amendment issues of free speech." (ROA.29, ¶ 88) No one on the HSAC or its Subcommittee "represents the media, physicians' organizations, religious institutions, free speech advocacy entities, or patient groups." (ROA.29, ¶ 89)

HSAC and its Subcommittee lack the fair balance required by FACA precedents:

> The court finds that the forest product ISACs are not 'fairly balanced' within the meaning of FACA, 5 U.S.C. app. 2 § 5(b)(2). … [D]efendants shall make a good faith effort to expedite the appointment of at least one properly qualified environmental representative to ISAC-10 and at least one properly qualified environmental representative to ISAC-12 as soon as possible.

*Nw. Ecosystem All. v. Office of the United States Trade Representative*, NO. C99-1165R, 1999 U.S. Dist. LEXIS 21689, at *29-30 (W.D. Wash. Nov. 8, 1999). This Fifth Circuit has held that this issue of "fairly balanced" is fully justiciable. *Cargill, Inc. v. United States*, 173 F.3d 323, 335 (5th Cir. 1999) ("We conclude that FACA's requirements that advisory committees be fairly balanced and adequately staffed are justiciable.").

Defendant Mayorkas himself expressly stated:

> The Department welcomes the recommendations of the Homeland Security Advisory Council [HSAC], which has concluded that countering

disinformation that threatens the homeland, and providing the public with accurate information in response, is critical to fulfilling the Department's missions.

DHS Statement, "Following HSAC Recommendation, DHS terminates

Disinformation Governance Board" (Aug. 24, 2022).[27] Those are recommendations

about the First Amendment which Defendant Mayorkas adopted without the fair

balance required.

In addition, FACA further requires that:

the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by each advisory committee shall be available for public inspection and copying at a single location in the offices of the advisory committee or the agency to which the advisory committee reports until the advisory committee ceases to exist.

5 U.S.C. app. 2 § 10(b). (ROA.29, ¶ 92) By failing to disclose to the public all the

records, reports, minutes, working papers, drafts, and other documents that were

prepared by or for the HSAC, Defendant Mayorkas further violates § 10(b) of

FACA. (ROA.33-34, ¶ 127)

HSAC does comply with some FACA requirements for transparency. But its

Subcommittee lacked transparency in making its pivotal recommendation related

to the DGB, as adopted immediately by Defendant Mayorkas. Defendant

Mayorkas's conduct in violating requirements of FACA was arbitrary, capricious,

an abuse of discretion, and contrary to law, in violation of the APA, 5 U.S.C. §

---

[27] *Id.*

706(2)(A), (B) and (D). Plaintiff AAPS continues to have a viable claim for FACA

disclosures, and it was a reversible error for the district court to dismiss this claim

without even addressing it.

### VI. As Applied Below in This Case, the Local Rule in Galveston Preventing Leave to Amend Is Contrary to the Federal Rules and Controlling Precedent, and Should Be Reversed.

Civil Local Rule 6 in the Galveston Division (Gal. Div. R. Prac. 6) sharply

curtails the ordinarily freely granted leave to amend a complaint, in violation of the

controlling Federal Rules of Civil Procedure and governing precedents of this

Court. A local district court rule cannot properly override the Federal Rules and

appellate precedents in this manner. Indeed, Galveston Local Rule 6 even infringes

on the right of the non-movant under the Federal Rules to amend the complaint

within 21 days of receiving a motion to dismiss. Instead Galveston Local Rule 6

limits that right to amend as follows:

> The party seeking dismissal shall further inform the respondent, by letter
> [which merely described the planned basis for moving to dismiss], of the
> right to amend the pleadings under these rules and Fed. R. Civ. P.
> 15(a)(1)(B), specifying that the amended pleading must be filed within 21
> days of the date of the letter. This letter functions as "service of a motion
> under Rule 12(b)" within the meaning of Fed. R. Civ. P. 15(a)(1)(B).

The district court in Galveston denies leave to amend at any time afterwards. But

FED. R. CIV. P. 15(a)(1)(B) expressly provides an automatic right to amend "21

days after service of a responsive pleading or 21 days after service of a motion

under Rule 12(b), (e), or (f)." The district court in Galveston improperly denies this

right guaranteed by the Federal Rules to a non-movant to amend the complaint

after a full review of a motion and its supporting brief.

This Fifth Circuit invalidated a local rule in the Eastern District of Texas by

explaining that:

> The Local Rule, however, is not a Federal Rule of Civil Procedure. It is not a rule that is followed throughout the nation or even throughout this Circuit, and although it is the product of careful consideration by practitioners and judges, it was not subject to possible congressional veto as were the Federal Rules of Civil Procedure.

*Ashland Chem. v. Barco Inc.*, 123 F.3d 261, 264 n.2 (5th Cir. 1997). Federal local

rules are promulgated under a federal statute that requires:

> The Supreme Court and all courts established by Act of Congress may from time to time prescribe rules for the conduct of their business. Such rules shall be consistent with Acts of Congress and rules of practice and procedure prescribed under section 2072 of this title [28 U.S.C. § 2072].

28 U.S.C. § 2071(a). In addition, local rules are subject to FED. R. CIV. P. 83(a) that

provides that a "local rule shall be consistent with — but not duplicative of — Acts

of Congress and rules adopted under 28 U.S.C. § 2072 ...." *See also Jackson v.

Crosby*, 437 F.3d 1290, 1293, 1296 (11th Cir. 2006) (rejecting "a long-standing but

invalid local rule on the computation of filing deadlines"); *United States v. One

Piece of Real Property*, 363 F.3d 1099, 1103 (11th Cir. 2004) (rendering void a

local rule regarding default by an absence of response to a motion, which

conflicted with the requirement in FED. R. CIV. P. 56 that the district court

independently review the record to enter judgment).

Plaintiff AAPS was never allowed to amend its complaint below, not even once. In denying Plaintiff AAPS's request in its brief below for leave to amend its complaint if defects were found by the district court in it, the district court expressly relied on its unusual Gal. Div. R. Prac. 6: "The court will provide parties an opportunity to amend their pleadings once ***before*** entertaining a Rule 12(b) motion to dismiss." Gal. Div. R. Prac. 6 (emphasis added). That narrow window to amend is long before the district court rules on a motion to dismiss, before a plaintiff has received briefing by the movant, and well before a plaintiff has researched, briefed, and filed his response to defendants' motions to dismiss. Plaintiff AAPS had no way of knowing at that very early stage which way the district court would go with its decision, or what defects the court may find to be material in the complaint. The notice contemplated by Galveston Division Local Rule 6 is nothing like an actual motion and full brief. Yet the district court denied Plaintiff AAPS's request for leave to amend by ruling that "[u]nder this court's local procedures, AAPS—who is represented by private counsel—was afforded an opportunity to amend. Gal. Div. R. Prac. 6."

This is not the standard for leave to amend as required by the Federal Rules or the precedents of this Fifth Circuit. The effect of the Galveston local rule is to prematurely dismiss cases, like this one, and burden the appellate court rather than initially litigate these issues more fully at the district court level. *See, e.g., Apter v.*

*HHS*, No. 22-40802, 2023 U.S. App. LEXIS 23401 (5th Cir. Sept. 1, 2023) (this

Court reversing and remanding on an appeal from the same district court after it

granted a similar motion to dismiss).

The Federal Rules expressly require that leave to amend shall be freely

granted: "The court should freely give leave when justice so requires." FED. R. CIV.

P. 15(a)(2). A local court rule cannot override that. This Fifth Circuit has held

likewise:

> The Federal Rules of Civil Procedure provide that "leave [to amend the complaint] shall be freely given when justice so requires." Fed.R.Civ.P. 15(a), *Lone Star Motor Import, Inc. v. Citroen Cars Corp.*, 288 F.2d 69, 75 (5th Cir. 1961). Granting leave to amend is especially appropriate, in cases such as this, when the trial court has dismissed the complaint for failure to state a claim. … We think the refusal to grant leave was not a valid exercise of the district court's discretion; rather, it was "merely abuse of that discretion and inconsistent with the spirit of the Federal Rules." *Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 230, 9 L. Ed. 2d 222 (1962).

*Griggs v. Hinds Junior Coll.*, 563 F.2d 179, 179-80 (5th Cir. 1977). *See also*

*Hernandez v. W. Tex. Treasures Estate Sales, L.L.C.*, No. 22-50048, 2023 U.S.

App. LEXIS 21619, at *6 (5th Cir. Aug. 17, 2023) (reversing, as an abuse of

discretion, a denial of leave to amend where, as here, the district court's opinion

expressed how additional allegations would have been relevant if included in the

complaint).

Based on an invalid local rule in Galveston, Plaintiff AAPS's request for leave to amend was denied. The local rule should be declared void because it conflicts with the Federal Rules and applicable precedents of this Court.

## CONCLUSION

Plaintiff-Appellant respectfully requests that this Court reverse the decision below, and remand for these proceedings to continue with leave to Plaintiff AAPS to amend its Complaint.

Dated:  September 10, 2023          Respectfully submitted,

/s/ Andrew L. Schlafly
Andrew L. Schlafly
Attorney at Law
939 Old Chester Road
Far Hills, New Jersey 07931
Tel: 908-719-8608
Fax: 908-934-9207
Email: aschlafly@aol.com

*Attorney for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

Certificate of Compliance With Type-Volume Limitation, Typeface Requirements, and Type Style Requirements pursuant to Fed. R. App. P. 32(a):

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

> this brief contains 12,821 words excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

> this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word in 14-point Times New Roman font.

Dated: September 10, 2023

s/ Andrew L. Schlafly
Attorney for Appellant
