# United States Court of Appeals
# for the Fifth Circuit

———————————

No. 23-40423

———————————

United States Court of Appeals
Fifth Circuit

**FILED**

June 3, 2024

Lyle W. Cayce
Clerk

ASSOCIATION OF AMERICAN PHYSICIANS AND SURGEONS
EDUCATIONAL FOUNDATION, AAPS,

*Plaintiff—Appellant,*

*versus*

AMERICAN BOARD OF INTERNAL MEDICINE, ABIM; AMERICAN
BOARD OF OBSTETRICS & GYNECOLOGY, ABOG; AMERICAN
BOARD OF FAMILY MEDICINE, ABFM; ALEJANDRO MAYORKAS,
*Secretary, U.S. Department of Homeland Security,*

*Defendants—Appellees.*

———————————

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 3:22-CV-240

———————————

Before KING, HO, and ENGELHARDT, *Circuit Judges*.

KURT D. ENGELHARDT, *Circuit Judge*:

The Association of American Physicians and Surgeons Educational
Foundation ("AAPS") alleges that the national medical specialty certifiers
American Board of Internal Medicine ("ABIM"), American Board of
Obstetrics & Gynecology ("ABOG"), American Board of Family Medicine
("ABFM") (together, the "Board Defendants") and Alejandro Mayorkas,
as Secretary of the U.S. Department of Homeland Security (the

No. 23-40423

"Department"), coordinated to censor and chill the speech of physicians, including some associated with AAPS, who spoke critically of positions taken by Dr. Anthony Fauci, lockdowns, mask mandates, Covid vaccination, and abortion. This was and continues to be done by labeling dissenting views as misinformation, disinformation, and malinformation, and the Board Defendants have expressly threatened to strip certification from otherwise qualified physicians who express such views. According to AAPS, Appellees' efforts to censor and punish physicians on issues of public concern harmed and continue to harm AAPS.

AAPS brought a host of claims against the Board Defendants and Department, including First Amendment and antitrust claims. The District Court dismissed all of AAPS's claims with prejudice, reasoning that it lacked standing to assert its claims against the Board Defendants and that the Department mooted claims against it by dissolving the Disinformation Governance Board ("DGB"), which AAPS alleged was responsible for censorship. It also denied AAPS the ability to amend its complaint even once under Galveston Division Local Rule 6, with no analysis for doing so.

The District Court incorrectly dismissed AAPS's First Amendment claims on standing grounds. AAPS provides sufficient allegations to support standing: (1) AAPS asserts an injury-in-fact through the Board Defendants' infringement on its right to hear "willing speakers," and it is premature to require AAPS to name specific "willing speakers" at the pleading stage; (2) AAPS can trace its injuries back to the Board Defendants' actions because physicians would likely "react predictably" when confronted with a threat of decertification: they would choose self-censorship over professional self-immolation; and (3) AAPS's injuries are redressable, as a ruling in its favor would allow for physicians to attend and speak at AAPS events (and thus allow AAPS to exercise its right to hear) without fear of decertification. We REVERSE. But, as the parties concede, the District Court did not reach the

No. 23-40423

looming question of whether the Board Defendants' acts qualify as state action. We decline to do so for the first time on appeal.

The District Court also erred in denying AAPS an opportunity to amend its complaint. Galveston Division Local Rule 6 impermissibly short circuits Federal Rule of Civil Procedure 15's liberal amendment scheme and our associated caselaw. And the District Court's cant invocation of futility, undue prejudice, and undue delay falls well short of the analysis we require in denying an opportunity to amend, so we REVERSE. We also VACATE the District Court's dismissal of AAPS's antitrust claims in light of our invalidation of Galveston Local Rule 6.

However, it was right to dismiss AAPS's claims against the Department because its complaint as currently written lacks sufficient allegations to overcome the government's good faith carveout to the mootness doctrine's voluntary cessation exception. But it mistakenly dismissed this claim *with* prejudice, even though jurisdictional dismissals (such as those made on standing and mootness grounds) are typically done without prejudice. So we MODIFY this dismissal to be *without* prejudice and AFFIRM as modified.

We REMAND for further proceedings consistent with this opinion.

No. 23-40423

# I. Background

## A. Factual

The Board Defendants have medical certification monopolies over their respective specialties. These certifications are primarily based on multiple-choice medical examinations. Board certifications constitute a *de facto* essential credential for physicians to practice and participate in most hospitals and insurance networks. Meaning that, while physicians are not *required* to have board certification to practice (state medical boards control licensure), lacking such certification *significantly* hamstrings their ability to do so. Stripping a physician of his certification is tantamount to revoking his license to practice medicine, given how few hospitals and networks permit uncertified, yet licensed, physicians to join. AAPS says that this monopoly status affords the Board Defendants an ability to exercise great power over physicians' speech.

So, AAPS contends, the Board Defendants' threats to strip certification improperly chilled speech without the political accountability of official state medical boards. And, through this chilling of speech, the Board Defendants interfered with the market for medical conferences and posting of such conferences to the internet. Some examples of chilling by the Board Defendants includes ABOG sending letters to all certified physicians threatening to strip them of their invaluable certification for making statements concerning abortion and contraception, or for warning pregnant women that the Covid vaccine could have negative side effects. ABIM and ABFM sent similarly threatening letters on May 26, 2022, to certified physicians for making statements disagreeing with positions taken by Dr. Fauci and the Biden Administration in handling the Covid pandemic. Indeed, AAPS notes that one of its conference speakers had his certification stripped by ABFM pending appeal.

No. 23-40423

AAPS alleges that the Board Defendants colluded with the Biden Administration, imposing such censorship to promote the Administration's political preferences in exchange for government endorsement of their certifications. The letters sent by the Board Defendants were, according to AAPS, sent nearly simultaneously and with similar terminology as "part of a broader campaign by the Biden Administration to advance its particular partisan agenda concerning Covid-19 and abortion." AAPS contends that this collusion, resulting in attendant censorship and chilling of speech, infringed on its First Amendment protections and interfered with its ability to participate in the marketplace.

Around the same time that the Board Defendants sent their letters, the Department created the (now defunct) DGB. The Department issued a press release in May 2022, directing the Homeland Security Advisory Counsel ("HSAC") to "make recommendations for how the Department can most effectively and appropriately address disinformation that poses a threat to the homeland, while protecting free speech and other fundamental rights."

The DGB announcement prompted a massive public backlash—20 State Attorneys General, led by the Virginia Attorney General and including Texas's, released a letter three days later, agreeing that "[t]he existence of the [DGB] will inevitably have a chilling effect on free speech" because "Americans will hesitate before they voice their constitutionally protected opinions, knowing that that government's censors may be watching[.]" They concluded that the DGB "*already* [was] chilling free speech and impeding the political process." (emphasis original). The DGB was "paused" soon after and eliminated in August 2022. But, according to AAPS, the DGB's agenda of retaliating against speech disfavored by the Biden Administration continues to be imposed by the Board Defendants and HSAC.

No. 23-40423

### B. Procedural

AAPS sued Appellees on July 12, 2022, in the Southern District of Texas, alleging First Amendment and antitrust violations against the Board Defendants, First Amendment and APA violations against the Department, and requesting declaratory and injunctive relief.[1] Defendants filed Motions to Dismiss in response. The District Court granted the Motions under Federal Rule of Civil Procedure 12(b)(1) in separate opinions: one for the Board Defendants and another for the Department. The District Court denied AAPS leave to amend its complaint based on Galveston Division Local Rule 6, even though AAPS had not been afforded even one chance to amend. *Id.* AAPS timely appealed.

## II. Standard of Review

Rule 12(b)(1) dismissals receive *de novo* review. *See Ballew v. Cont'l Airlines, Inc.*, 668 F.3d 777, 781 (5th Cir. 2012); *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011). Legal questions relating to standing and mootness receive the same. *See NRA of Am., Inc. v. McCraw*, 719 F.3d 338, 343 (5th Cir. 2013); *Env't Conservation Org. v. City of Dallas*, 529 F.3d 519, 524 (5th Cir. 2008); *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 659 (5th Cir. 2006). And "[t]he validity of a local court rule [also] presents an issue of law to be determined *de novo* on appeal." *Barbosa v. County of El Paso*, 158 F.3d 584, 1998 WL 648596, at *2 (5th Cir. 1998) (citing *Ashland Chem. Inc. v. Barco Inc.*, 123 F.3d 261, 263 (5th Cir. 1997)).

---

[1] AAPS also asserted tortious interference with business relations claims against the Board Defendants, but those claims are not at issue in this appeal.

No. 23-40423

## III. Discussion

### A. AAPS has standing for its First Amendment claims against the Board Defendants.

The District Court dismissed AAPS's First Amendment claims against the Board Defendants on standing grounds, reasoning that it met none of the doctrine's requirements. "To have standing, a plaintiff must (1) have suffered an injury in fact, (2) that is fairly traceable to the challenged action of the defendant, and (3) that will likely be redressed by a favorable decision." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020). "[S]tanding rules are relaxed for First Amendment cases so that citizens whose speech might otherwise be chilled by fear of sanction can prospectively seek relief." *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 782 (5th Cir. 2024) (inner quotations omitted); *Justice v. Hosemann*, 771 F.3d 285, 294 (5th Cir. 2014) ("Recall that standing rules are relaxed for First Amendment cases…."). We address each element in turn and find standing exists here, so we REVERSE. But we decline to address the state action issue for the first time on appeal.

> *1. AAPS has an injury-in-fact through a First Amendment right to hear, and requiring it to identify a specific "willing speaker" in its complaint is premature.*

AAPS and the Board Defendants focus on whether the Board Defendants' threats damaged AAPS's First Amendment right to hear threatened physicians' speech. "To satisfy th[e] injury-in-fact test, Plaintiffs therefore must allege more than an injury to *someone's* concrete, cognizable interest; they must 'be [themselves] among the injured.'" *McMahon v. Fenves*, 946 F.3d 266, 270 (5th Cir. 2020) (alteration and emphasis orig.) (quoting *Sierra Club v. Morton*, 405 U.S. 727, 734–35 (1972)). Here, AAPS alleges that it bases its case on the Board Defendants' infringement of its right

to hear speakers who would speak but for the Board Defendants' chilling actions, as its conferences and publications rely on robust debate.

"The First Amendment protects the right to hear as well as to speak," so that which "silences a willing speaker . . . also works a constitutional injury against the hearer." *Basiardanes v. City of Galveston*, 682 F.2d 1203, 1211 (5th Cir. 1982) (citing *Va. State Board of Pharmacy v. Va. Citizens Consumer Couns., Inc.*, 425 U.S. 748, 756 (1976) ("Freedom of speech presupposes a willing speaker. But where a speaker exists . . . the protection afforded is to the communication, to its source and recipients both.")), *abrogated on other grounds by City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986).[2] "Recipients of protected communications have standing only if there is a speaker who wishes to express himself or herself." *Id.* (citing *Va. State Board of Pharmacy*, 425 U.S. at 754). The parties debate whether AAPS must, at the pleading stage, identify a specific "willing speaker" whose speech has been chilled for AAPS to hear to establish an injury-in-fact: AAPS says no, while the Board Defendants say yes. At this stage, AAPS is right.

In *Basiardanes v. City of Galveston*, this Circuit reviewed an appeal from a trial where the plaintiff brought a First Amendment right to hear claim. 628 F.2d at 1209. This Circuit, directly after acknowledging "the right to hear as well as to speak," found no standing for the following reason:

> The record here fails to disclose the existence of a willing speaker affected by the ordinance, other than Basiardanes. Although several witnesses testified that Galveston's market

---

[2] The District Court mistakenly believed that this Circuit had not yet spoken on a "right to hear," so it instead looked to a Third Circuit case for guidance when it decided that no injury-in-fact existed. But this Circuit *has* addressed the issue in the above-cited and other cases. *See, e.g.*, *Brooks v. Auburn Univ.*, 412 F.2d 1171, 1172 (5th Cir. 1969) ("The First Amendment, applicable to a state university through the Fourteenth Amendment, embraces the right to hear.").

> could support an additional adult theater, none testified that he would open such a theater but for Ordinance 78-1. *In the absence of a willing speaker*, we reject Basiardanes' argument that he has standing to request injunctive relief in the capacity as a movie viewer.

*Id.* (emphasis added). In other words, Basiardanes lacked standing because he could not show a willing speaker *after going through discovery and trial. See id.* The Board Defendants' reliance on a Third Circuit decision is faulty for the same reason: that decision concerned an appeal from a two-day bench trial. *Pa. Fam. Inst., Inc. v. Black*, 489 F.3d 156, 162 (3d Cir. 2007). But we are nowhere near trial here.

AAPS's claims were dismissed before AAPS could engage in meaningful (if any) discovery, and it was not afforded even a *single* opportunity to amend its complaint. AAPS's complaint alleges that numerous physicians have been affected by the Board Defendants' threats, any one of whom could serve as a witness and "willing speaker." That one is not identified by name directly and expressly in the complaint is unsurprising and begs the question—the entire point of AAPS's suit is that the Board Defendants chilled physicians' speech by threatening significant, career-damaging retaliation. And the parties do not identify any cases that would require a specifically named "willing speaker" at the pleading stage.

AAPS sufficiently alleges an injury-in-fact: that the Board Defendants, through their censorship campaign, deprived AAPS of a "willing speaker" that would have voiced his/her opinions but for the threat of decertification, injuring AAPS's right to hear. And there is no requirement that AAPS allege or name a specific "willing speaker" at the pleading stage.

*2. AAPS can trace its First Amendment injuries to the Board Defendants, and those injuries are redressable.*

AAPS and the Board Defendants then debate whether the injury inflicted on AAPS by the Board Defendants' censorship efforts is traceable, given that the physicians are independent third parties. "Standing 'is ordinarily substantially more difficult to establish' when 'a causal relation between injury and challenged action depends upon the decision of an independent third party.'" *Daves v. Dallas County*, 22 F.4th 522, 543 (5th Cir. 2022) (cleaned up) (quoting *California v. Texas*, 593 U.S. 659, 675 (2021)). In such circumstances, "the plaintiff[s] must show at least 'that third parties will likely react in predictable ways.'" *Missouri v. Biden*, 83 F.4th 350, 369–70 (5th Cir. 2023) (quoting *California*, 593 U.S. at 675). But again, "standing rules are relaxed for First Amendment cases so that citizens whose speech might otherwise be chilled by fear of sanction can prospectively seek relief." *Nat'l Press Photographers Ass'n*, 84 F.4th at 644. And one must accept AAPS's well-pled allegations as true and draw all reasonable inferences in its favor at this stage. *Meador v. Apple, Inc.*, 911 F.3d 260, 264 (5th Cir. 2018).

The Board Defendants argue that the physicians, as independent third parties, break the causal chain between themselves and AAPS's claims of financial loss due to physicians' speech being chilled by the Board Defendants' threats. They rest this argument on the same platform as their injury-in-fact argument: that AAPS has not identified a "willing speaker" or other person who would have attended a conference or spoken at one, but engaged in self-censorship because of the Board Defendants' threats. These decisions by independent third parties, according to the Board Defendants, are what cause AAPS's injuries, not the Board Defendants' behavior.

But this ignores the fact that these physicians "will likely react in predictable ways" when confronted with a threat of "stop saying things about

Covid-19, Dr. Fauci, and abortion that we don't like, or we will neuter your ability to practice medicine through decertification." *See Missouri*, 83 F.4th at 369–70 (Plaintiffs "must show at the least 'that third parties will likely react in predictable ways.'") (quoting *California*, 593 U.S. at 675). Namely, physicians will likely choose self-censorship over professional self-immolation given the certification requirement that the vast majority of hospitals and insurance networks have. But there is no requirement that AAPS name specific "willing speakers" at the pleading stage. The Board Defendants' argument here is unavailing.

The Board Defendants pivot to a second argument: AAPS's injuries, if they satisfy the state action requirement, were caused by actions dictated by government actors instead of the Board Defendants' independent application of certification requirements. The Board Defendants argue that AAPS "fails" to "come forward with facts" like the plaintiffs in *Missouri v. Biden*, and such failure renders their claims too speculative. But this comparison is not on point as it again demands too much of a party that has not yet had the benefit of discovery. The plaintiffs in *Missouri v. Biden did* get the benefit of discovery, as evidenced by the reams of documents considered by this Circuit in the appeal of a preliminary injunction. *See Missouri*, 83 F.4th at 359–66 (discussing same). In contrast, the District Court here dismissed on a motion to dismiss and did not even grant one chance at filing an amended complaint, much less permit initial discovery.

One can trace AAPS's injury in this direction as well. Assuming all well pled facts as true, drawing all inferences in AAPS's favor, and applying the lower threshold used in evaluating standing for First Amendment claims, it is indeed plausible that the Board Defendants would act like the social media companies in *Missouri v. Biden*. They would "likely act in [a] predictable" fashion when told by the Department to suppress dissenting opinions because they would be "reluctan[t] to risk the adverse legal or

regulatory consequences that could result from a refusal to adhere to the government's directives." *Id.* at 370. Like the plaintiffs in *Missouri v. Biden*, AAPS alleges sufficient facts showing that the Board Defendants "will likely react in a predictable way—*i.e.*, censoring speech—in response to the government's actions." *Id.* at 370–71. So, this second argument fails too.

"The final element of Article III standing—redressability—require[s] . . . [p]laintiffs to demonstrate that it was 'likely, as opposed to merely speculative, that the [alleged] injury will be redressed by a favorable decision.'" *Missouri*, 83 F.4th at 371 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). Again, looking through the relaxed First Amendment standing lens while applying the motion to dismiss standard, it is plausible that a favorable decision would redress AAPS's injury: physicians would be unmuzzled and unafraid to speak dissenting opinions and attend AAPS's conferences, helping restore its lost attendance and lost revenue.

AAPS sufficiently alleges injury-in-fact, traceability, and redressability for its First Amendment claims against the Board Defendants, meaning it has standing to pursue those claims. So we REVERSE the District Court. But an outstanding issue demands attention: the state action requirement.

### 3. We decline to address the state action issue and remand to the District Court for first instance consideration.

While the government cannot abridge free speech, U.S. CONST. amend. I, private parties typically bear no such burden. *See Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 812 (2019) ("[A] private entity is not ordinarily constrained by the First Amendment because the private entity is not a state actor."). But sometimes private entities may be considered state actors, becoming subject to the prohibition against abridging free speech in the process. *See Missouri*, 83 F.4th at 373–82 (discussing state action

requirement in the First Amendment context). So, potential plaintiffs wishing to bring First Amendment claims against private parties must plausibly allege that they satisfy the state action requirement.

While the parties provided considerable briefing on whether AAPS sufficiently alleges state action, they concede that the District Court did not address this question. "We decline to address th[is] issue[] for the first time on appeal, and instead leave [it] for the district court to resolve on remand." *Abraugh v. Altimus*, 26 F.4th 298, 306 (5th Cir. 2022); *see also, e.g.*, *Gil Ramirez Grp., L.L.C. v. Hous. Indep. Sch. Dist.*, 786 F.3d 400, 411 (5th Cir. 2015) (remanding so district court could consider issues in first instance); *Lone Star Nat. Bank, N.A. v. Heartland Payment Sys., Inc.*, 729 F.3d 421, 427 (5th Cir. 2013) ("[W]e decline to decide these complex issues as they are better addressed by the district court in the first instance."); *Breaux v. Dilsaver*, 254 F.3d 533, 537–38 (5th Cir. 2001) (declining to consider issues not ruled upon by the district court).

## B. The District Court improperly denied AAPS an opportunity to amend its complaint through Galveston Division Local Rule 6.

The District Court dismissed all of AAPS's claims without granting it leave to amend *even once*, citing Galveston Division Local Rule 6. That rule provides in pertinent part:

> The court will provide parties an opportunity to amend their pleadings once before entertaining a Rule 12(b) motion to dismiss. To advance the case efficiently and minimize the costs of litigation, the court requires a party intending to file a motion to dismiss under Rule 12(b) to confer with opposing counsel concerning the expected motion's basis. The party seeking dismissal shall further inform the respondent, by letter, of the right to amend the pleadings under these rules and Fed. R. Civ. P. 15(a)(1)(B), specifying that the amended pleading must be filed within 21 days of the date of the letter. This letter

functions as "service of a motion under Rule 12(b)" within the meaning of Fed. R. Civ. P. 15(a)(1)(B). . . . *Once the motion to dismiss is filed, the non-movant shall not be allowed to amend its pleading until disposition of the motion to dismiss and upon leave from the court.*

Gal. Div. Loc. R. 6 (emphasis added). "The validity of a local court rule presents an issue of law to be determined *de novo* on appeal." *Barbosa*, 158 F.3d 584, 1998 WL 648596, at *2 (citing *Ashland Chem. Inc.*, 123 F.3d at 263). Local rules "*must be consistent with*—but not duplicate—federal statutes and rules adopted under 28 U.S.C. §§ 2072 and 2075." Fed. R. Civ. P. 83(a) (emphasis added).

FRCP 15(a) governs leave to amend, stating "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). We review denials of leave to amend for abuse of discretion, but the term "discretion" is a bit misleading: it tends to be an abuse of discretion to flatly *deny* litigants the ability to amend their complaint, without exercising such discretion. *See Stripling v. Jordan Prod. Co*, 234 F.3d 863, 872 (5th Cir. 2000) ("In the context of motions to amend pleadings, 'discretion' may be misleading, because [Rule 15(a)] evinces a bias in favor of granting leave to amend."); *see also, e.g., Stem v. Gomez*, 813 F.3d 205, 215 (5th Cir. 2016) ("A court must have a substantial reason to deny a party's request for leave to amend."); *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 291 (5th Cir. 2006) ("[T]here is a strong presumption in favor of granting leave to amend[.]"); *Mayeaux v. La. Health Serv. & Indem. Co.*, 376 F.3d 420, 425 (5th Cir. 2004) ("[D]istrict courts *must* entertain a presumption in favor of granting parties leave to amend." (emphasis added)).

"[L]eave to amend should be liberally granted, when the plaintiff might be able to state a claim based on the underlying facts and circumstances." *Hernandez v. W. Tex. Treasure Est. Sales, L.L.C.*, 79 F.4th

464, 468 (5th Cir. 2023) (citing *Brewster v. Dretke*, 587 F.3d 764, 767–68 (5th Cir. 2009)). "This court has a strong preference for *explicit* reasons in denying leave to amend, and we have expressly stated that motions to amend should be freely granted *and that a district court's failure to explain its reasons for denying the motion typically warrants reversal*." *Id.* (first emphasis orig.) (quoting *N. Cypress Med. Ctr. Operating Co.*, *v. Aetna Life Ins.*, 898 F.3d 461, 478 (5th Cir. 2018)). In *Hernandez*, this Court reversed a district court's refusal to allow leave to amend. *Id.* Even though that panel agreed with the district court's determination that the complaint in question did not pass Rule 12(b) muster, it still presented enough information to suggest that the plaintiffs could replead and satisfy the standard. *Id.* at 468–69. It also determined that the district court failed to provide an explanation for why it refused to permit amendment, which "[g]iven our well-established precedent. . . was an abuse of discretion." *Id.* at 469 (citing *Bazrowx v. Scott*, 136 F.3d 1053, 1054 (5th Cir. 1998)).

AAPS was wrongly denied an opportunity to amend for two reasons. *First*, Galveston Division Local Rule 6 inverts how FRCP 15 operates in practice, demanding amendment "*before* entertaining a Rule 12(b) motion to dismiss." Gal Div. Loc. R. 6 (emphasis added). Normally, plaintiffs facing a motion to dismiss go through a process of receiving briefing from the movant, conducting research and submitting opposing briefing to the district court, and finally receiving a ruling identifying potential flaws in their original complaint. Galveston Division Local Rule 6 short circuits that process.

It instead requires plaintiffs to amend their complaint after "conferring with" opposing counsel via letter (a letter which most likely will fail to lay out the full grounds for dismissal), or risk dismissal after the first motion to dismiss battle without being given a chance to amend. Galveston Division Local Rule 6 contradicts FRCP 15(a) and this Circuit's caselaw which require that leave "be liberally granted," especially in cases where, like

here, the plaintiff seems able to replead to satisfy the 12(b) standard on at least some of its claims. *See* Fed. R. Civ. P. 83(a); *Hernandez*, 79 F.4th at 468–69. It impermissibly forecloses repleading via amendment, a routine practice sanctioned under FRCP 15(a).

*Second*, the District Court did not give any explicit, much less meaningful, explanation as to why it refused leave to amend beyond a citation to Galveston Division Local Rule 6 and a cant invocation of futility, undue delay, and unfair prejudice that involved no analysis at all. Its attempts to fault AAPS for not moving to amend ring hollow, as AAPS was not permitted to move to amend under Galveston Division Local Rule 6 until the District Court issued its ruling, and it dismissed AAPS's claims with prejudice, starting the clock to file a notice of appeal. The District Court should have given AAPS a chance to amend. Its failure to do so, particularly without any analysis, was an abuse of discretion. We REVERSE.[3]

## C. The DGB's dissolution mooted AAPS's claims against the Department.

The District Court dismissed AAPS's claims against the Department on mootness grounds, reasoning that the DGB's post-complaint dissolution mooted AAPS's claims and that the government was entitled to its presumption of good faith to combat the voluntary cessation exception. "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (quotation omitted). In other words, "[m]ootness applies when intervening circumstances render the court no

---

[3] We VACATE the District Court's dismissal of AAPS's antitrust claims in light of our invalidation of Galveston Division Local Rule 6.

longer capable of providing meaningful relief to the plaintiff." *Ctr. for Biological Diversity, Inc. v. BP Am. Prod. Co.*, 704 F.3d 413, 425 (5th Cir. 2013) (citing *Harris v. City of Houston*, 151 F.3d 186, 189 (5th Cir. 1998)). "[A] case challenging a statute, executive order, or local ordinance usually becomes moot if the challenged law has expired or been repealed." *Spell v. Edwards*, 962 F.3d 175, 179 (5th Cir. 2020). But plaintiffs can invoke the voluntary cessation exception when this happens.

The voluntary cessation exception requires courts to examine defendant-induced mootness cautiously. *See Yarls v. Bunton*, 905 F.3d 905, 910 (5th Cir. 2018). Normally, voluntary conduct doesn't moot a case unless a defendant demonstrates that "it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Freedom from Religion Found., Inc. v. Abbott*, 58 F.4th 824, 833 (5th Cir. 2023) (quoting *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 325 (5th Cir. 2009), *aff'd on other grounds sub nom. Sossamon v. Texas*, 563 U.S. 277 (2011). But the government enjoys a "good faith" carveout here. When governmental officials voluntarily cease potentially wrongful conduct, we "presume that [they], as public representatives, act in good faith." *Freedom from Religion Found., Inc.*, 58 F.4th at 833. And "[w]ithout evidence to the contrary, we assume that formally announced changes to official governmental policy are not mere litigation posturing." *Sossamon*, 560 F.3d at 325. "Among other things, the government's ability to reimplement the statute or regulation at issue is insufficient to prove the voluntary-cessation exception." *Freedom from Religion Found., Inc.*, 58 F.4th at 833.

AAPS attempts to present evidence in its briefs that the Department should not be treated with the good faith presumption normally afforded to the government with citations to Department press releases as well as news articles. But the evidence it presents only shows that the DGB *could* be established, not that it *will* be reestablished. That's not enough, because "the

government's *ability* to reimplement the statute or regulation at issue is insufficient to prove the voluntary-cessation exception." *Id.* (emphasis added). AAPS cannot overcome mootness based on the allegations contained within the complaint, at least as it is currently written. We AFFIRM.

### D. The District Court erred in dismissing AAPS's claims with prejudice.

The District Court dismissed all of AAPS's claims with prejudice. This is erroneous because it granted dismissal on jurisdictional (here, standing and mootness) grounds. Even the government concedes as much in its brief: "To the extent that this Court affirms the dismissal for lack of subject-matter jurisdiction, the government would not object to modifying the judgment to dismissal without prejudice. *See, e.g.*, *Greiner v. United States*, 900 F.3d 700, 705–06 (5th Cir. 2018)." "Ordinarily, when a complaint is dismissed for lack of jurisdiction, *including lack of standing*, it should be without prejudice." *Denning v. Bond Pharmacy, Inc.*, 50 F.4th 445, 452 (5th Cir. 2022) (emphasis added) (quoting *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 468 (5th Cir. 2020)). To the extent that we affirm the District Court's dismissal here, we MODIFY it to be *without* prejudice.

## V. Conclusion

For the foregoing reasons, we MODIFY the District Court's dismissal of AAPS's claims against the Department generally to be *without* prejudice, and AFFIRM that dismissal as modified. We next REVERSE the District Court's dismissal of AAPS's First Amendment claims against the Board Defendants on standing grounds, but decline to address the state action issue to allow the District Court an opportunity to address it first on remand. Finally, we REVERSE the District Court's denial of AAPS's opportunity to amend its complaint as an abuse of discretion and VACATE

No. 23-40423

its dismissal of AAPS's antitrust claims in light of our invalidation of Galveston Division Local Rule 6. We REMAND to the District Court for further proceedings consistent with this opinion.

No. 23-40423

James C. Ho, *Circuit Judge*, dissenting in part:

Doctors deserve our tremendous respect. We trust them to provide us with the best available medical advice and treatment. But they're not perfect. Doctors are "susceptible to peer pressure, careerism, ambition, and fear of cancel culture, just like the rest of us." *Whole Women's Health v. Paxton*, 10 F.4th 430, 468 (5th Cir. 2021) (Ho, J., concurring).[1]

At various times throughout history, medical care has suffered—and patients have been harmed, even killed—because doctors succumbed to social pressure and desire for approval and advancement. *See id.* at 465–68, 468 n.1 (collecting examples). We may "look back in disbelief at [doctors] who ridiculed and ostracized proponents of handwashing and sterilizing surgical instruments to prevent disease and infection." *Id.* at 470. But we would do well to learn from our past. Yes, we should absolutely follow the science. But that doesn't mean we should always follow scientists. Because scientists don't always follow the science. *Id.* at 465.

\* \* \*

In this case, a medical association contends that certain medical boards and federal officials have conspired—and continue to conspire—to censor and even destroy the careers of any physician who dares to express the "wrong" viewpoints on a wide range of medical topics, including but not

---

[1] *See generally*, *e.g.*, Sherwin B. Nuland, The Doctors' Plague: Germs, Childbed Fever, and the Strange Story of Ignác Semmelweis (2003); Lindsey Fitzharris, The Butchering Art: Joseph Lister's Quest to Transform the Grisly World of Victorian Medicine (2017); *see also* Samir Okasha, Philosophy of Science: A Very Short Introduction 77 (2nd ed. 2016) (scientists are subject to "peer pressure"); Katalin Karikó, Breaking Through: My Life in Science 184 (2023) ("I had become a very good scientist. But I was learning that succeeding at a research institution like Penn required skills that had little to do with science.").

No. 23-40423

limited to Dr. Anthony Fauci, COVID-19 lockdown policies, mask mandates, vaccines, and abortion.

These are alarming allegations. After all, these issues are far from scientifically settled as Defendants claim. They should remain the subject of open and rigorous discussion—not self-censorship and cancellation. *See*, *e.g.*, *id.* at 468–69 (citing Sydney Page, *A newborn weighed less than a pound and was given a zero percent chance of survival. He just had his first birthday.*, WASH. POST, June 23, 2021); *id.* at 468 n.1 (noting conflicting medical views regarding COVID-19); *but see* Dan Diamond & McKenzie Beard, *A Fauci adviser deleted emails. Congress demanded to know why*, WASH. POST, May 23, 2024 ("At the peak of the coronavirus pandemic, the longtime National Institutes of Health official [David Morens] encouraged colleagues to evade federal records requirements . . . [to] protect his high-profile former boss Anthony S. Fauci and others from unwanted scrutiny."); Allysia Finley, *What Was Anthony Fauci's Top Aide Hiding?*, WALL ST. J., May 26, 2024 ("Anthony Fauci's former top adviser worked to keep the public in the dark and thwart investigations into Covid's origins.").

So the association brought suit under the First Amendment and federal antitrust law, as well as other claims.

But the district court not only dismissed all claims with prejudice—it denied the association the ability to amend its complaint even once, contrary to the Federal Rules of Civil Procedure.

I agree with the majority that the district court erred. I would simply go further, and accordingly dissent in part. I would remand this case for further proceedings on all of the association's claims—including those against the government officials sued here, which the majority dismisses as moot. That said, I'm grateful that the majority has made clear that the association should have full opportunity to amend its complaint on remand.

No. 23-40423

So whatever disagreement there may be on this panel, it may ultimately make no practical difference to the future course of this litigation.

## I.

The association alleges ongoing efforts by federal officials to censor disfavored viewpoints within the medical community.

In April 2022, Secretary Alejandro Mayorkas announced the establishment of the Disinformation Governance Board within the U.S. Department of Homeland Security. This announcement followed public pleas from the White House for social media companies and media outlets to stop spreading "misinformation" regarding COVID-19. As the district court acknowledged, the Board's stated purpose was to "guide and support the Department's efforts to address mis-, dis-, and mal-information that threatens security."

The Department paused the Board in May 2022. At that time, Mayorkas asked an advisory council within the Department to evaluate the Board and offer insight on how the Department could "effectively and appropriately address disinformation." The council formed a subcommittee that met throughout the summer.

The association filed its complaint in this matter in July 2022. The complaint alleged that the Board would violate the First Amendment rights of the association and others. It also alleged that the Board violated the separation of powers and the Administrative Procedure Act. And it alleged that Secretary Mayorkas's use of the advisory council raised concerns under the APA and the Federal Advisory Committee Act. The association requested that the district court enjoin the Department to abolish and "permanently discontinue" the Board and comply fully with FACA. The association also sought declaratory relief.

One month later, in August 2022, the subcommittee issued its final report, concluding that there was "no need for a separate . . . [b]oard" to support the Department's "underlying work of . . . address[ing] disinformation threat streams." The subcommittee also emphasized the need for "a more strategic approach to disinformation" and for the Department to "develop a unified strategy to counter disinformation campaigns that appear in social media." Secretary Mayorkas adopted the report and dissolved the Board later the same day.

## A.

The district court held, and the majority agrees, that the Board's dissolution moots the association's claims against the Secretary. I disagree.

"[A] defendant cannot automatically moot a case"—and thereby avoid accountability—"simply by ending its unlawful conduct once sued." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013). "[S]ubsequent events [must] make it *absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur." *Trinity Lutheran Church of Columbia, Inc., v. Comer*, 582 U.S. 449, 457 n.1 (2017) (cleaned up) (emphasis added).

So when government officials voluntarily cease some action in response to litigation, courts are supposed to be skeptical. That's because an official "could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends." *Already*, 568 U.S. at 91. "We should be suspicious . . . of officials who try to avoid judicial review by voluntarily mooting a case—especially in the absence of . . . credible assurance of future compliance." *U.S. Navy SEALs 1–26 v. Biden*, 72 F.4th 666, 677–78 (5th Cir. 2023) (Ho, J., dissenting) (quotations omitted).

Those suspicions are fully warranted here. During oral argument, counsel for the government refused to assure us that the Department would

neither reconstitute the Board nor replicate its functions through other means. Oral Argument at 17:43–18:37. In *Navy Seals*, there was at least a belated, post-oral argument stratagem by federal officials to abandon their prior course of conduct. *See* 72 F.4th at 674–75. The panel majority there regarded that belated effort as sufficient assurance of mootness. I dissented, noting that our circuit precedent requires greater skepticism than that. But we don't even have that much here.

## B.

That said, the majority has made clear that the association will have the opportunity to add new claims against the government on remand.

Before the district court, the association contended that dissolution of the Board did not terminate the government's campaign of censorship against disfavored viewpoints. To the contrary, the association alleged that the Department was simply dispersing the Board's intended functions to others, citing among other things the subcommittee's final report.

The district court refused to allow the association to proceed on these theories. The majority rightly concludes that the district court's refusal was erroneous, and that the association will have leave to amend.

## II.

The association also alleges censorship efforts by medical licensing boards, and contends that those acts violate not only the First Amendment, but also federal antitrust law.

At present, the association pleads a monopolization claim under § 2 of the Sherman Act. 15 U.S.C. § 2. Economic actors who hold a monopoly violate this section "when [they] exercise [their] power to . . . exclude competitors from the relevant market." *Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Ass'n*, 776 F.3d 321, 334 (5th Cir. 2015). The

association alleges that the licensing boards have certification monopolies in their respective medical practice areas, that certification is a de facto requirement to practice medicine, and that the boards are invidiously abusing their market power to exclude physicians who express dissenting views on COVID-19 and abortion.

The district court found that the association lacks antitrust standing because it is not a competitor, purchaser, or consumer of the licensing boards. But the district court also acknowledged that physicians could suffer antitrust injury from a violation. On remand, the association is welcome to add a physician to its complaint.

Moreover, the association may add a collusion claim under § 1 of the Sherman Act. 15 U.S.C. § 1. During oral argument, counsel for the boards agreed that collusion between members of a medical association to exclude certain services from patients could violate § 1. *See* Oral Argument at 32:27–33:01 ("Collusion always creates antitrust problems."). Counsel further acknowledged that an agreement to exclude certain viewpoints and shun providers who adopt such views could constitute "a concerted refusal to deal under § 1." Oral Argument at 35:03–37:59. *See generally FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447 (1986).

\* \* \*

In a nation of over 300 million Americans, we're bound to disagree on a wide range of issues. Indeed, "the Anti-Federalists opposed the proposed United States Constitution and the creation of our national government for that very reason." *United States v. Seekins*, 52 F.4th 988, 989 (5th Cir. 2022) (Ho, J., dissenting from denial of rehearing en banc). They feared that we would be too "diverse," too "heterogenous," to succeed as one nation. *Id.* (quoting Brutus I (Oct. 18, 1787), *in* 2 The Complete Anti-Federalist 370 (Herbert J. Storing ed. 1981)).

The Federalists took precisely the opposite view.  They believed we'd be better off if we "[e]xtend the sphere" and "take in a greater variety of parties and interests."  The Federalist No. 10, at 83 (James Madison) (Clinton Rossiter ed., 1961).  *See also* The Federalist No. 51, at 324 (noting the benefits of a "multiplicity of interests").  Our Founders were "confiden[t] in the power of free and fearless reasoning," and in "expos[ing] . . . falsehood and fallacies, [and] avert[ing] . . . evil by the processes of education"—"more speech, not enforced silence."  *Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring).

It's our good fortune that the Federalists prevailed.  Our acceptance of diverse viewpoints is what makes this country the most successful in human history.  Our Nation was uniquely founded on a commitment to pluralism, and our "firm belief in the robust and fearless exchange of ideas as the best mechanism for uncovering the truth."  *Lefebure v. D'Aquilla*, 15 F.4th 670, 674 (5th Cir. 2021).

In America, we don't fear disagreement—we embrace it.  We persuade—we don't punish.  We engage in conversation—not cancellation.  We know how to disagree with one another without destroying one another.

Or at least that's how it's supposed to work.  As the Supreme Court recently reminded us, our Constitution is premised on our firm conviction that "viewpoint discrimination is uniquely harmful to a free and democratic society."  *NRA v. Vullo*, 602 U.S. __, __ (2024).  Intolerance of differing views contradicts our Founding principles.

Although I dissent in part, I am grateful that, under the court's decision today, the association will have full and fair opportunity to amend its complaint on remand.